DECISION
Following a jury trial verdict for the defendants, plaintiffs move for a new trial, pursuant to Rule 59 of the Super. R. Civ. P., to which the defendant, Ivor M. Jackson, M.D., objects.
 Facts/Travel
The plaintiff's medical malpractice action against Ivor M. Jackson, M.D. (Dr. Jackson or the defendant) and the Rhode Island Hospital was tried before a jury for over nineteen days in September and early October of 2000. Sharon Lavoie (plaintiff) alleged that the defendant negligently diagnosed and treated her thereby causing a more than three-year delay in diagnosis and treatment of her thyroid cancer. This delay, the plaintiff claimed, has caused the cancer to advance to a stage at which, in addition to the need for ongoing medical care, there is a significant likelihood of premature death. Additionally, the plaintiff asserted a negligence count against Rhode Island Hospital essentially in its capacity as the defendant's employer, as well as claims for loss of parental companionship against each defendant on behalf of plaintiff's daughter, Bethany Tiernan.
On October 4, 2000, the jury found in favor of the defendant on the malpractice claim, specifically responding in the negative to the following threshold jury interrogatory: "Do you find that Plaintiff Sharon Lavoie has proven, by a fair preponderance of the credible evidence, that Defendant Dr. Jackson was negligent in his care and treatment of her from July 23, 1985, through July 31, 1990?" Accordingly, judgment on the verdict entered for the defendants.
Thereafter, the plaintiff filed this timely motion for new trial to which the defendant objected. After review of the respective memoranda, the Court heard oral argument, following which the plaintiff and the defendant submitted supplemental memoranda. In her motion, the plaintiff claims that the verdict was contrary to the weight of credible evidence and, further, that it failed to respond to the merits of the case and failed to administer substantial justice between the parties. Conversely, the defendant submits that the jury had adequate credible evidence to support its verdict which should not be disturbed.
 Standard of Review
The role of a trial justice when reviewing a motion for a new trial is well settled in this jurisdiction. The trial justice, sitting as an extra juror, must "independently weigh, evaluate and assess the credibility of the trial witnesses and evidence." Graff v. Motta, 748 A.2d 249, 255 (R.I. 2000) (quoting Morrocco v. Piccardi, 713 A.2d 250, 253 (R.I. 1998) (per curiam)). He or she may accept some or all of the evidence and reject testimony because it is impeached or contradicted by other positive testimony or by circumstantial evidence or because it is inherently improbable or at variance with undisputed physical facts or laws. Barbarto v. Epstein, 97 R.I. 191, 193, 196 A.2d 836, 837. The trial justice also may add to the evidence by drawing proper inferences. Id. at 193-94, 196 A.2d at 837. Upon determining that the evidence is evenly balanced or is such that reasonable minds, in considering the same evidence, could come to different conclusions, then the trial justice must allow the verdict to stand, Graff, 748 A.2d at 255, even if the trial justice entertains some doubt as to its correctness. Marcotte v. Harrison, 443 A.2d 1225, 1232 (R.I. 1982). However, if after making an independent review of the evidence, the trial justice finds that the jury's verdict is against the fair preponderance of the evidence and failed to do substantial justice, the verdict must be set aside. Reccko v. Criss Cadillac Co., Inc., 610 A.2d 542, 545 (R.I. 1992) (citing Sarkisian v. New Paper, Inc., 512 A.2d 831, 835 (R.I. 1986)). Even though the trial justice "need not perform an exhaustive analysis of the evidence, he or she must refer with some specificity to the facts which prompted him or her to make the decision so that the reviewing court can determine whether error was committed." Reccko, 610 A.2d at 545 (citing Zarrella v. Robinson, 460 A.2d 415, 418 (R.I. 1983)).
 Review of the Evidence
The parties presented two distinct theories of this case and a plethora of evidence, including an array of expert testimony, each outstanding, in support thereof. Such testimony made the case all the more riveting and all the more difficult.
Dr. Jackson was plaintiff's treating endocrinologist from July 23, 1985, through December 21, 1992. After medical examinations for a sore throat revealed an enlarged neck and possible hyperactive thyroid, the plaintiff came under Dr. Jackson's care during her teenage years. It is undisputed that Dr. Jackson diagnosed the plaintiff's condition of Hashimoto's thyroiditis[1] in July of 1985 and thereafter followed her for routine care over the next several years. The plaintiff made no allegation with respect to said diagnosis.
The plaintiff claimed, however, that a mass on the isthmus[2] of her thyroid gland was a prevalent nodule which probably was present as early as July 23, 1985, and definitely present on July 31, 1990. She further contended that the prevailing standard of care required diagnostic evaluation of the discrete nodule, specifically fine needle aspiration and biopsy. Dr. Jackson's failure to discern this nodule as such and to perform these procedures, the plaintiff asserted, prevented him from timely discovering her thyroid cancer. Consequently, the plaintiff argued, the cancer metastasized thereby eliminating any opportunity for cure and imposing a significantly reduced life expectancy. Contrastingly, Dr. Jackson asserted that the bump on the plaintiff's thyroid was a pyramidal lobe,[3] not a dominant nodule. As such, he contended, biopsy was not indicated. The defendant further argued that the size of this bump, even if it were determined to be a discrete nodule, was such that the relevant standard of care did not require biopsy intervention.
The plaintiff testified that during a pre-employment physical examination at the Rhode Island Hospital on June 12, 1990, Antonia M. Maki, M.D. told her that she had a nodule on her thyroid and that she should follow-up with her endocrinologist. In response, the plaintiff testified, she went directly to Dr. Jackson's office for evaluation. After relaying her concern about the lump to Dr. Jackson through his secretary, she was told to wait until July 31, 1990, her next scheduled appointment. In the interim, the plaintiff's father, David Tiernan, arranged for her to be evaluated by Anthony D. Duva, M.D.
The plaintiff's father testified that Dr. Duva told him that he had detected "a lump in the middle of the [plaintiff's] neck, which was located on her isthmus." The plaintiff and her father each testified that, on July 31, 1990, they told Dr. Jackson and Endocrinology Fellow Jose M. Mandry, M.D. about the findings of Drs. Maki and Duva with respect to a lump on the plaintiff's isthmus. The plaintiff further testified that during that appointment, Dr. Jackson expressed his awareness of her condition and reassured her. In addition, he advised that if the lump became larger or she had difficulty swallowing, further investigation would be indicated.
After biopsy on September 9, 1993, the plaintiff underwent neck dissection surgery on October 27, 1993. The pathology report indicated papillary carcinoma. Subsequent tests revealed that the thyroid cancer had invaded the deep tissues of the plaintiff's neck and the base of her skull. By the time of trial, the cancer had metastasized to both of plaintiff's lungs.
Dr. Jackson testified that he felt a "bump" that he described as a small mass on the plaintiff's isthmus. He further testified that the mass was a pyramidal lobe, or an anatomical variant of a thyroid gland, which did not require biopsy. He had documented the presence of the pyramidal lobe on July 23, 1985, July 31, 1990, and on December 1, 1992. While testifying, Dr. Jackson drew a representation of what he had felt on the plaintiff's isthmus (drawing). His drawing resembled a small, rounded bump in the center of the isthmus.
The plaintiff's pre-employment physical at Rhode Island Hospital on June 12, 1990 was a prerequisite to her being employed there as a registered nurse. During cross-examination, the plaintiff admitted that during her course of studies to become a registered nurse, notwithstanding the fact that she was actively treating for her thyroid condition, she had no desire to, and took no action to, learn more about it. Given her obvious intelligence and training, it strains credulity that plaintiff evinced so little interest in her condition. In addition, plaintiff testified that she had never noticed that her neck was enlarged, even when confronted with her high school photograph which distinctly demonstrated an enlarged neck Again, it strains credulity that plaintiff, very bright and articulate, would find nothing disconcerting about this photograph.
In addition to her father and herself, the plaintiff relied on the expertise of Drs. Maki and Duva as well as her surgeon, Kirby I. Bland, M.D. Dr. Maki, the internist at Rhode Island Hospital, performed the plaintiff's pre-employment physical on June 12, 1990. She testified that, based on her examination, the plaintiff's thyroid was multi-nodular, lumpy and bumpy, and as such, was consistent with Hashimoto's disease. In her documentation, she described the thyroid as "nodular," the plural of nodule, as opposed to containing a discrete nodule.
Dr. Duva, an otolaryngologist and Chief of Ear, Nose and Throat Surgery at St. Joseph's Hospital in Providence, testified that on June 15, 1990, he found one "small lump" that was "coming from the midline of the thyroid, called the isthmus." He further stated that the bump was "hard," "fixed," and "not mobile." After examining the plaintiff on June 15, 1990, Dr. Duva had documented his findings as "a little nodule present on the thyroid isthmus." He had also documented the plaintiff's chief complaint as "lump in neck." While testifying, Dr. Duva opined, "You don't have to be a space scientist to know that you are not supposed to have a bump over there." During cross-examination, however, Dr. Duva admitted that he had no knowledge regarding a pyramidal lobe.
By videotaped deposition testimony, Dr. Bland, the surgeon who resected the plaintiff's thyroid gland on October 27, 1993, confirmed his pre-operative examination finding, as he had noted October 6, 1993, of a "palpable central 0.5 cm midline mass" on the plaintiff's thyroid gland. He did not identify a pyramidal lobe.
In addition, the plaintiff presented two endocrinologists and a rebuttal witness, Bruce Wenig, M.D., a pathologist, as expert witnesses. Norman J. Marieb, M.D., an endocrinologist and professor at Yale University, testified that the relevant standard of care required diagnostic studies upon detection of a hard nodule and in conjunction with the other symptoms reported by the plaintiff. According to Dr. Marieb, ultrasound and fine needle biopsy constituted the appropriate diagnostic interventions.
In particular, Dr. Marieb testified that Dr. Jackson's medical management of the plaintiff from July 23, 1985, until June 12, 1990, was reasonable, appropriate and within the standard of care. However, beginning on June 12, 1990, according to Dr. Marieb, Dr. Jackson failed to meet the appropriate standard of care when he failed to attend to the reported finding and presence of a nodule on the plaintiff's thyroid gland. Specifically, Dr. Marieb indicated that Dr. Jackson failed to (1) examine the plaintiff on June 12, 1990, (2) appreciate that the plaintiff's reported finding of a nodule by two other physicians (Maki and Duva), in combination with her symptoms on July 31, 1990, indicated the possibility of thyroid cancer, (3) detect the nodule on July 31, 1990, and (4) perform ultrasound and fine needle aspiration of the nodule on and/or after July 31, 1990. Additionally, Dr. Marieb opined that the examinations of the plaintiff by Dr. Jackson and other Endocrinology Clinic physicians on April 2, 1991, December 3, 1991, and December 1, 1992, violated the standard of care with respect to the known existence of a nodule in June of 1990 and in light of the September of 1993 discovery of advanced papillary cancer. Further, Dr. Marieb testified that Dr. Jackson failed to respond to the plaintiff's presentation, including enlarged lymph nodes, on December 3, 1991. According to Dr. Marieb, Dr. Jackson's failure to suspect and investigate the possible presence of cancer constituted negligence. As a result of these deviations from the standard of care, Dr. Marieb testified, the plaintiff's cancer remained undiagnosed and without intervention for more than three years. Consequently, the opportunity for curative surgery before the cancer had advanced beyond the thyroid, in Dr. Marieb's opinion, was lost.
Leonard Wartofsky, M.D. of Washington Hospital Center in Washington, D.C., an endocrinologist, a recognized authority on thyroid cancer and the plaintiff's attending endocrinologist since approximately April of 2000, testified that Dr. Jackson did not meet the standard of care because "the finding of a discrete nodule in the gland would be the indication for a fine needle aspiration cytology." Unlike Dr. Marieb, however, he opined that the plaintiff's other symptoms would not have influenced him very much. The finding of a lump in the thyroid would be, in his opinion, the primary indication for further investigation. Further, based upon Dr. Jackson's drawing, Dr. Wartofsky further opined that Dr. Jackson violated the standard of care in 1985 as well as in 1990. However, Dr. Wartofsky conceded that he would not biopsy tissue that he believed to be a pyramidal lobe, a mere anatomical anomaly. In addition, he testified at length about the plaintiff's damages resulting from Dr. Jackson's negligence, including the likelihood of her having a reduced life expectancy. Dr. Wartofsky testified that, as a result of the defendant's negligence, the plaintiff will die because of the metastasized thyroid cancer, most likely within the next 2 to 15 years. Additionally, he recognized Dr. Jackson as an expert in endocrinology.
The defendant presented five expert witnesses, the first of whom was Dr. Monchik. J. M. Monchik, M.D., Chief of Endocrine Surgery at Rhode Island Hospital, testified that Dr. Jackson met the standard of care during the period of July of 1990 through 1993. He further testified that there was no palpable nodule on the plaintiff's thyroid during the relevant period but the standard of care would require biopsy if a dominant nodule had been present on the plaintiff's isthmus. Further, he testified that the mass on the plaintiff's thyroid, if a nodule and not a pyramidal lobe, did not require biopsy because it was too small. In addition, he opined that any alleged delay in diagnosis has not reduced the plaintiff's life expectancy in light of the type of cancer and the extent of lymph node involvement.
James V. Hennessey, M.D. of Rhode Island Hospital, an endocrinologist and the plaintiff's treating physician following Dr. Jackson, testified that Dr. Jackson met the standard of care. However, he also acknowledged that "a distinct nodule should be biopsied." Like Dr. Monchik, Dr. Hennessey conceded that his opinion in support of Dr. Jackson's having met the standard of care would be different if a distinct nodule had been present.
Both Drs. Monchik and Hennessey testified that earlier diagnosis would have made no difference in the treatment or prognosis with this particular form of thyroid cancer in a person with the plaintiff's characteristics. Papillary thyroid carcinoma, they opined, metastasizes early in its course and, based on its advanced state, had probably done so before July of 1990. They opined that Dr. Jackson's care of the plaintiff did not adversely affect the outcome.
Blake Cady, M.D., a surgeon from Providence, Rhode Island, testified that Dr. Jackson met the standard of care. In his opinion, there was no need for a needle biopsy in 1990. Even if one had been done, he testified, because the cancer was microscopic in nature, it was unlikely that it would have been detected by such a biopsy. Further, he concurred with Dr. Monchik that biopsy was not required because the suspect bump was too small.
Jose M. Mandry, M.D., an Endocrinology Fellow at Rhode Island Hospital Endocrinology Clinic in 1990 and currently an internal medicine practitioner in Florida, had examined the plaintiff on July 31, 1990, with Dr. Jackson. Dr. Mandry testified that he palpated a slightly enlarged, irregular, non-tender thyroid and that there was no nodule present at that time. He further testified that if the plaintiff had told him that another physician had detected a nodule, he would have documented the same in the medical record. In addition, he stated that he might not have recorded a pyramidal lobe in the plaintiff's medical record because its presence is a normal variant of a thyroid.
Drs. Monchik, Hennessey and Mandry all agreed that based on Dr. Jackson's determination that the mass on plaintiff's thyroid was a pyramidal lobe, biopsy was not indicated. These three experts were in accord with Dr. Jackson that the applicable standard of care was not violated.
The jury had before it expert testimony that a biopsy was not indicated due to the smallness of the mass. In support thereof, the defendant submitted "the Mazzaferri Study," which indicated that "asymptomatic thyroid nodules that are one centimeter or smaller and found by chance by CT scan" need not be biopsied.
The post-surgical pathology report of Rhode Island Hospital dated November 1, 1993 (report), stated that upon microscopic examination the tissue samples, including the tissue from the isthmus, indicated the presence of papillary thyroid cancer. However, the report did not contain any reference to either an identifiable nodule or a pyramidal lobe. The parties contested the meaning of the pathology data. The absence of a reference to a nodule, the defendant argued, supported the theory that the subject mass was a pyramidal lobe. Contrastingly, the plaintiff argued that the report simply identified the presence of cancer and lacked a specific description of the tissue samples. The plaintiff further suggested that a pathologist would mention a pyramidal lobe because its presence is a variant from normal. Additionally, the plaintiff argued that the discrete nodule detected by Dr. Duva in 1990 could have appeared differently by 1993.
The plaintiff's rebuttal witness, Bruce M. Wenig, M.D., a pathologist from Montefiore Medical Center in Bronx, New York, addressed the pathology report and relevant standard of care. Dr. Wenig conceded that the pathology report described fibrous tissue but did not reference a discrete nodule. However, it documented diffuse microscopically-identifiable cancer cells which occupied approximately 10 percent of the thyroid. Dr. Wenig testified that if the pathologist at Rhode Island Hospital had identified a nodule, he would have been required to submit it to microscopic examination and to document it in the pathology report. He conceded that, when selecting areas for microscopic examination, a pathologist is supposed to submit the areas of greatest suspicion.
Dr. Maki's documentation of the pre-employment physical refers to the plaintiff's thyroid as "nodular." During her deposition testimony, Dr. Maki described the plaintiff's thyroid as "multi-nodular," "lumpy," and "bumpy." Such findings were not inconsistent with Hashimoto's disease, the condition diagnosed by Dr. Jackson. Several entries in the plaintiff's Rhode Island Hospital Endocrinology Clinic records also describe the plaintiff's thyroid gland as "multi-nodular." In addition, the October 1993 pre-operative notes of Dr. Bland and his colleague Dr. Jeffrey Slaby indicated that the plaintiff's thyroid was multi-nodular. Although Dr. Bland documented his finding of a palpable midline mass in 1993, he did not specify whether the mass was a pyramidal lobe or a nodule. In addition, he did not mention a pyramidal lobe in his operative note.
Clinically, Drs. Jackson and Duva detected a bump. In 1985, 1990 and 1992, Dr. Jackson described the bump that he detected as a pyramidal lobe; in 1990, Dr. Duva labeled the lump that he palpated as a nodule. Dr. Bland detected a .05 cm mass in October of 1993. Experts on both sides agreed that the relevant standard of care required biopsy of a dominant nodule, if present, on the isthmus. However, the experts differed as to the presence of a discrete nodule versus a pyramidal lobe. Dr. Jackson consistently noted that the growth was a pyramidal lobe and the jury believed him. Significantly, there was ample evidence that plaintiff's thyroid was multi-nodular with no dominant nodule; only Dr. Duva mentioned a discrete nodule. Further, despite his insistence on the presence of a nodule, the jury was free to accept Dr. Duva's admitted lack of knowledge with respect to a pyramidal lobe variance. In addition, based on Dr. Mandry's testimony, the jury could have reasonably accepted that he might not have documented the presence of a pyramidal lobe in the plaintiff's medical record. The plaintiff's argument that a disparity between Dr. Jackson's drawing and a treatise diagram of a pyramidal lobe supports the presence of a discrete nodule was countered by several defense witnesses who testified that pyramidal lobes exist in different sizes and shapes. Further, the plaintiff's contention that the determination of the presence of a pyramidal lobe is suspect because only Dr. Jackson documented it and he did so without descriptors and/or without emphasis of its uncommon nature to the Endocrinology Fellows is not necessarily compelling. The fact that other doctors or Endocrinology Fellows who treated the plaintiff failed to make reference to a pyramidal lobe does not necessarily preclude its existence. Moreover, the plaintiff's allegation that subsequent to the plaintiff's cancer diagnosis, Dr. Jackson fabricated his documentation with respect to his finding of a pyramidal lobe is totally unsubstantiated and was considered by the jury. Further, the jury could have accepted that even if the subject bump were a prominent nodule in 1990, its size was such that the relevant standard of care did not mandate biopsy. In addition, the jury could have concluded from the testimony of Dr. Wenig, plaintiff's pathologist, that because the pathology report did not indicate the presence of a nodule in the resected tissue, no nodule was present. Finally, the plaintiff argued that the defendant's expert testimony was not credible in light of several of the defense witnesses "personal biases" and "persistent evasiveness" pursuant to their professional relationships and/or involvement as plaintiff's former direct-care provider(s). However, cross-examination of each witness was exhaustive and allowed the jury to consider the plaintiff's testing of defense witnesses regarding the possibility of bias or prejudice. See, e.g., Atlantic Refining Co. v. Director of Public Works, 102 R.I. 696, 713, 233 A.2d 423, 432 (1967). Based on the credible evidence, despite plaintiff's contentions to the contrary, the jury could accept Dr. Jackson's pyramidal lobe defense.
It is clear to this trial justice that the evidence, including the expert testimony and relevant exhibits, as well as the reasonable inferences drawn therefrom are sufficiently balanced such that reasonable people could fairly arrive at different conclusions with respect to the presence of a discrete nodule or pyramidal lobe. The jury was confronted with one compelling expert witness after another. In the parade of excellent expert witnesses, each expert was impressive in presentation, thoroughness, and delivery. Each physician who testified was credible and worthy of belief. Obviously, the jury chose to find some witnesses more compelling than others and believed that, based on the plaintiff's clinical presentation during the pertinent time, the defendant had performed his duties in accordance with the then-existing standard of care. Accordingly, this Court cannot substitute its judgment, even if it might be to the contrary, in place of the jury's decision. In this Court's opinion, the verdict in favor of the defendant is based on ample credible testimony and evidence. For the foregoing reasons, this Court cannot say that the verdict fails to respond to the evidence or that the evidence preponderates in favor of the plaintiff. Reasonable minds could have come to different conclusions. The jury's verdict is substantiated by the evidence. Accordingly, the plaintiff's motion for a new trial must be and is denied.
Counsel shall submit the appropriate order for entry.
[1] Hashimoto's thyroiditis, "also termed lymph-adenoid goiter, is a common chronic inflammatory disease of the thyroid in which autoimmune factors play a prominent role. . . . Goiter [enlargement of the thyroid] is the outstanding feature. The enlargement involves the entire gland but not necessarily symmetrically. Typically, the consistency is rubbery, the margins are scalloped, and the general outline of the gland is preserved. The pyramidal lobe may be prominent." Harrison's Principles of Internal Medicine 1692, 1712 (John D. Wilson et al. eds., 12th ed. 1991).
[2] "[T]he central part of the thyroid gland joining the two lateral lobes." Stedman's Medical Dictionary 930 (27th ed. 2000). 
[3] "[A]n inconstant narrow lobe of the thyroid gland that arises from the upper border of the isthmus and extends upward. . . ." Stedman's Medical Dictionary 1027 (27th ed. 2000).