**Supreme Court**

JPL Livery Services, Inc. d/b/a Ocean State     :
Transfer

             v.                  :            No. 2013-119-Appeal.
                                              (PC 08-8293)

Rhode Island Department of Administration     :
et al.

JPL Livery Services                :

            v.                  :            No. 2013-120-Appeal.
                                              (PC 06-2570)

State of Rhode Island et al.         :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

JPL Livery Services, Inc. d/b/a Ocean State   :
Transfer

       v.                 :         No. 2013-119-Appeal.
                                            (PC 08-8293)

Rhode Island Department of Administration   :
et al.




JPL Livery Services                 :

       v.                 :         No. 2013-120-Appeal.
                                            (PC 06-2570)

State of Rhode Island et al.        :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

# O P I N I O N

**Chief Justice Suttell, for the Court.** The plaintiff, JPL Livery Services, appeals from a January 2, 2013 judgment in favor of the defendants, the Rhode Island Department of Administration and the Rhode Island Department of Health (collectively, the state).[1] The plaintiff and the state were parties to a service contract in which the plaintiff agreed to provide livery services for the transportation of human remains. The plaintiff challenges the trial justice's findings that the contract was not exclusive and that the state's unilateral termination of

---

[1] The full complement of defendants in these consolidated cases included various state agencies and officials: the State of Rhode Island; David R. Gifford, Director of the Department of Health; Thomas Gilson, Chief Medical Examiner; Robert O'Donnell; Rosemary Booth Gallogly; Jerome D. Moynihan; the Rhode Island Department of Administration; and the Rhode Island Department of Health.

the contract did not constitute a breach. This case came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Procedural History

Pursuant to multiple contracts beginning in 1998, Joseph Pilosa operated a service for the transportation of human remains from various locations in the state to the Office of Medical Examiners (OME), which is a subdivision of the Rhode Island Department of Health (DOH).[2] Pilosa's transportation company was called JPL Livery Services (JPL), and Pilosa served as its president. The contract at issue in this case covered a five-year period from July 1, 2005 until June 30, 2010, and it provided a "cost per case" price of $125 for transports from the greater Providence area, and $130 for all other areas of the state.

The state selected JPL as its livery service provider through a bidding process. The terms of JPL's contract with the state were set forth in two documents: the notice of price agreement award, which listed basic contract terms such as price and termination criteria, and the bid solicitation, which provided specific requirements for JPL's performance of the service contract and which was incorporated by reference into the notice of price agreement award. The notice of price agreement award contained the following language:

---

[2] This livery service consisted of responding to a call from the OME that provided the location of a decedent, driving to that location, assisting the on-scene investigator with handling the body and sometimes placing a toe tag on the body for identification, inserting the body into a bag, and then removing the bagged body and transporting it to the OME.

"This is a multi-year bid/contract. Per Rhode Island state law 37-2-33, contract obligations beyond the current fiscal year are subject to availability of funds. Continuation of the contract beyond the initial fiscal year will be at the discretion of the state. Termination may be effected by the state based upon determining factors such as unsatisfactory performance or the determination by the state to discontinue the goods/services, or to revise the scope and need for the type of goods/services; also management owner determinations that may preclude the need for goods/services.

"Delivery of goods or services as requested by agency."

The bid solicitation also provided that JPL's livery services were "to be provided to the [OME] on a 24/7/365 basis as requested by the [OME] staff." From July 2005 until March 2006, JPL was the OME's sole livery service provider. Pilosa testified at trial that JPL had also been the sole transportation provider pursuant to a previous contract beginning in the year 2000.

In October 2005, Robert O'Donnell was hired as Medicolegal Administrator of the OME, which put him "in charge of [the OME's] daily operations." O'Donnell held a meeting with Pilosa in March 2006, in which Pilosa was informed that O'Donnell would be limiting the number of transports to be conducted by JPL. O'Donnell told Pilosa that personnel from the OME, as well as agents and scene investigators, would assume transportation duties between the hours of 8 a.m. and 4 p.m., Monday through Saturday. O'Donnell explained at trial that the DOH was "looking for ways to reduce [the OME's] budget," and he determined that it would be less expensive for the state to use its own personnel rather than pay JPL's "cost per case" transport fee. After this meeting, the state significantly reduced its use of JPL's services.

JPL filed suit against the state, the Director of the DOH, the Chief Medical Examiner, and O'Donnell in May 2006, alleging that O'Donnell breached the contract when he decreased JPL's transportation services and began using OME employees to fill in the gaps. JPL sought a

temporary restraining order,[3] injunctive relief, and compensatory damages. JPL continued to provide livery services for the state while the litigation was pending.

The contract also required JPL to provide the state with certain documentation regarding JPL's employees, vehicles, and insurance policies. Specifically, the contract mandated that JPL provide "proof of valid driver['1]s licenses for all employees," "proof of workers['1] compensation insurance," and "proof of background checks done on all employees." The contract further required JPL to "provide to the [OME] any changes in personnel," and to "immediately" provide the above documentation for new employees. JPL was also required to provide license plate numbers and proof of insurance for its vehicles and to submit annual insurance renewal certificates for its insurance policies. Additionally, the contract contained criteria for the manner in which JPL was to conduct its transportation services, including a time limit for responding to a scene after receiving a call from the OME. The contract also specified that, "[u]pon removal of a decedent from the scene location, [JPL] will proceed directly to the [OME] office unless directed to do otherwise by the Medical Examiner."

In 2007, DOH personnel authored several letters indicating various issues with JPL's transportation services. Pilosa received a letter from O'Donnell dated January 25, 2007, in which O'Donnell referred to an incident involving "[JPL] employees stopping after picking up a decedent for the [OME] and not responding directly to [OME]." Pilosa also received a letter from O'Donnell dated March 22, 2007, which referenced an incident where one of Pilosa's employees had made an error in writing a decedent's name on a toe tag.

The Chief Medical Examiner wrote a letter to Pilosa dated April 27, 2007, in which he indicated that JPL's "liability contract" and "workers['1] compensation insurance contract" were

---

[3] JPL's motion for a temporary restraining order was denied.

outdated. This letter also requested license plate numbers and proof of insurance for JPL's vehicles, as well as a list of "all past and present [JPL] employees under the current contract," and documentation including driver's licenses, background checks, and records of employee training. This letter requested that JPL provide the missing documents by May 4, 2007. JPL's attorney then received a letter dated May 25, 2007, from the Acting Assistant Director of Health, which referred to the information requested in the April 27, 2007 letter and stated that "[t]he purchase order and contract for services require that this information be provided to the [DOH] on an annual basis," and that, "[a]s of this date, the Medical Examiner has not received any information from Mr. Pilosa * * * ."

O'Donnell sent a letter to the Assistant Director for Special Projects within the state's Department of Administration (DOA), dated June 29, 2007, which asserted a "formal complaint against [JPL] * * * based on poor performance and not meeting the requirements of [the contract]." Specifically, O'Donnell wrote that a JPL employee had been arrested in May 2005 for stealing a credit card from a decedent, and another decedent's son had filed a complaint in 2006 regarding money that went missing from his father's wallet while JPL employees were transporting the body. O'Donnell also referred to incidents listed in his letters to Pilosa, including JPL incorrectly labeling a decedent and JPL failing to timely provide required documentation. O'Donnell wrote in the final paragraph of the letter: "Based on the above information * * * we are formally requesting that the contract with JPL * * * be terminated immediately. The lack of response raises very serious concerns about the integrity of services provided by the contractor and the potential for harm to the citizens of Rhode Island."

JPL's counsel then received a letter dated July 19, 2007, from Jerome Moynihan, who was the Administrator of Purchasing Systems within the DOA,[4] in which Moynihan stated that "DOH maintains that JPL failed to timely provide to DOH required updates on JPL's insurance coverage, bond status, vehicle registration information and criminal background checks for JPL employees." Moynihan also stated in this letter, however, that "DOA is aware that JPL is now in substantial compliance with DOH's request for production and documentation." Moynihan warned that "any future failure by JPL to comply with the terms of its contract with the State shall result in punitive action being taken, including but not limited to, termination of JPL's contract with the State." Moynihan testified at trial that he viewed this letter as an "an olive branch," meaning that JPL would be allowed "time to remediate" past faults regarding its contractual obligations.

Roughly four months later, Pilosa received another letter from the Chief Medical Examiner, Thomas Gilson, MD, dated November 30, 2007, which listed nine JPL employees for whom the state had not received required documentation, including driver's licenses and background checks. Doctor Gilson also requested documentation of JPL's current liability insurance coverage. This letter warned that, "[i]f the [OME] is not in receipt of the above documentation by December 6, 2007, [OME] will seek termination of your contract. Further, be advised that any other non-compliance and/or violation of the terms of the contract will result in termination without additional warning."

Pilosa also received a letter from Dr. Gilson dated December 5, 2007, in which Dr. Gilson complained that Pilosa had transported a deceased two-year-old child from a hospital in

---

[4] Moynihan testified that as Administrator of Purchasing Systems, he would receive requisitions from the DOH outlining a need for services and was responsible for soliciting bids to fill these needs.

his arms, and that "[t]his transport involved passing by the cafeteria window, which upset several people there." This letter also stated that "[t]his conduct is unacceptable and has been addressed with you previously by the prior Chief Medical Examiner when a similar complaint was lodged by South County Hospital." At trial, Pilosa denied having passed by a cafeteria while carrying this body from the hospital, and he stated that it was his practice to not place the bodies of small children and infants on adult-sized stretchers.[5]

The state terminated JPL's contract on December 10, 2007. Pilosa received notice of the termination in a letter from Moynihan, which stated that, "[p]ursuant to the bid award, the State of Rhode Island may, with or without cause, terminate services within the sole discretion of the State." The letter also stated that, notwithstanding this discretion, "the State has determined that JPL is in serious violation of the terms of the award." The letter enumerated three specific violations: background checks on six of the nine JPL employees listed in Dr. Gilson's November 2007 letter revealed criminal records; JPL had taken more than its allotted one hour to arrive at the locations of decedents on two occasions in August 2007; and JPL had violated established protocol by transporting a child in arms rather than on a carrier under a protective covering, as mentioned in the December 2007 letter.

JPL filed a second lawsuit in December 2008 against the DOA and the DOH, alleging that the state breached the contract by terminating the agreement in bad faith and without cause.[6] The two cases were consolidated in August 2010 and tried without a jury for six days in March

---

[5] As for the letter's reference to a similar complaint lodged in the past, Pilosa explained that a hospital employee had previously complained because Pilosa had not backed his truck into the proper loading area, which Pilosa explained was due to the fact that there was a laundry cart in the area that was too heavy to move.

[6] JPL also filed an amended verified complaint for the 2006 lawsuit in May 2010, which added Rosemary Booth Gallogly and Jerome D. Moynihan as defendants.

and April 2012. The trial consisted primarily of the testimonies of Pilosa, O'Donnell, and Moynihan.

Before trial, the state made a motion in limine to prohibit plaintiff from mentioning or introducing evidence to suggest that the contract was an exclusive agreement between the state and JPL. The trial justice preliminarily denied the motion and then issued a bench decision granting the motion on the fifth day of trial. She found that the language of the contract was clear and unambiguous, and that there was "no language [in the contract] to suggest the DOH was required to exclusively use JPL for its transportation needs." The trial justice further found:

> "[T]he contract clearly states that JPL was to pick up and deliver the decedents' bodies only when the DOH requested it to do so. A plain reading of that language suggests that were the DOH to decide it wanted to use other vendors for its transportation requirements or to have its own employees make these deliveries, as it was done here, the DOH could do so."

Accordingly, the trial justice ruled that JPL was prohibited from introducing parol or extrinsic evidence to suggest that the parties intended the contract to be exclusive.

At the conclusion of plaintiff's case, the DOH and the DOA moved for judgment as a matter of law pursuant to Rule 52 of the Superior Court Rules of Civil Procedure. The trial justice reserved her decision and at the conclusion of testimony instructed the parties to file post-trial memoranda. On December 26, 2012, the trial justice issued an eighteen-page decision finding that "the State lawfully terminated its contract with JPL in good faith and that the State did not breach the same contract by using its own employees for livery services prior to termination." Judgment for defendants was entered on January 2, 2013, and plaintiff timely appealed.

## II

## Standard of Review

Rule 52(a) of the Superior Court Rules of Civil Procedure requires a trial justice in a nonjury case to "find the facts specially and state separately its conclusions of law thereon * * * ." The trial justice, however, "need not engage in extensive analysis to comply with this requirement." Connor v. Schlemmer, 996 A.2d 98, 109 (R.I. 2010) (quoting Nardone v. Ritacco, 936 A.2d 200, 206 (R.I. 2007)). "This Court has 'recognized that [a] trial justice's analysis of the evidence and findings in the bench trial context need not be exhaustive * * * .'" Notarantonio v. Notarantonio, 941 A.2d 138, 144 (R.I. 2008) (quoting McBurney v. Roszkowski, 875 A.2d 428, 436 (R.I. 2005)). "[I]f the decision reasonably indicates that [the trial justice] exercised [his or her] independent judgment in passing on the weight of the testimony and the credibility of the witnesses it will not be disturbed on appeal unless it is clearly wrong or otherwise incorrect as a matter of law." Id. at 144-45 (quoting McBurney, 875 A.2d at 436).

"It is well settled that [t]his Court will not disturb the findings of a trial justice sitting without a jury unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence * * * ." Reagan v. City of Newport, 43 A.3d 33, 37 (R.I. 2012) (quoting Notarantonio, 941 A.2d at 144). On review, "[w]e accord great weight to a trial justice's determinations of credibility, which, inherently, 'are the functions of the trial court and not the functions of the appellate court.'" Cullen v. Tarini, 15 A.3d 968, 976 (R.I. 2011) (quoting Raheb v. Lemenski, 115 R.I. 576, 579, 350 A.2d 397, 399 (1976)). If "the record indicates that competent evidence supports the trial justice[']s findings, we shall not substitute our view of the evidence for his [or hers] even though a contrary conclusion could have been reached." Reagan,

43 A.3d at 37 (quoting Notarantonio, 941 A.2d at 144). We will, however, review questions of law de novo. Cullen, 15 A.3d at 977.

III

Discussion

A

JPL's Exclusivity Argument

The plaintiff argues that the trial justice erroneously interpreted the contract to allow for the OME's use of its own personnel, rather than solely JPL's personnel, for transporting human remains. In this vein, plaintiff contends that the trial justice should not have granted the state's motion in limine regarding extrinsic evidence of the parties' intent to form an exclusive agreement. The state, on the other hand, argues that the trial justice correctly discerned that the plain meaning of the contractual language "as requested" did not create an exclusive agreement.

The determination of whether a contract's terms are ambiguous is a question of law to be decided by the court. Furtado v. Goncalves, 63 A.3d 533, 537 (R.I. 2013). We review questions of law de novo. Cullen, 15 A.3d at 977. We need not, however, "construe contractual provisions unless those terms are ambiguous." DiPaola v. DiPaola, 16 A.3d 571, 576 (R.I. 2011) (quoting A.F. Lusi Construction, Inc. v. Peerless Insurance Co., 847 A.2d 254, 258 (R.I. 2004)). "In assessing whether contract language is ambiguous, 'we give words their plain, ordinary, and usual meaning. * * * The subjective intent of the parties may not properly be considered by the Court; rather, we consider the intent expressed by the language of the contract.'" Furtado, 63 A.3d at 537 (quoting Derderian v. Essex Insurance Co., 44 A.3d 122, 128 (R.I. 2012)). Thus, "[i]n situations in which the language of a contractual agreement is plain and unambiguous, its meaning should be determined without reference to extrinsic facts or aids." Id. at 537 (quoting

- 10 -

Garden City Treatment Center, Inc. v. Coordinated Health Partners, Inc., 852 A.2d 535, 542 (R.I. 2004)).

Here, the contract provided in both the notice of price agreement award and the bid solicitation that JPL's services were to be provided "as requested" by the state. The plain and ordinary meaning of this phrase indicates that JPL was obligated only to transport human remains when the state desired it to do so. This language is not ambiguous, and we find nothing else in the contract to suggest that the state was required to rely solely on JPL for its livery needs. The state, therefore, did not breach or alter the terms of the contract when it began using its own personnel for some of its transportation needs in March 2006. Because the contractual language is clear and unambiguous, plaintiff's subjective intent as to whether the agreement was exclusive has no bearing on the outcome of this issue. Accordingly, we affirm the trial justice's grant of the state's motion in limine regarding extrinsic evidence of intent, as well as her ruling that the contract was not an exclusive agreement.

**B**

**Termination of the Contract at the State's Discretion**

The plaintiff also argues that the trial justice made an error of law when she interpreted the contract's termination language. According to plaintiff, the contract allowed for unilateral termination only "at certain times, and for specific reasons." Specifically, plaintiff states that the contract could be terminated for "untimely insurance filings" or for "lack of funds," circumstances which, according to plaintiff, did not form the basis for the state's termination in December 2007. The notice of price agreement award contains two paragraphs that discuss termination of the contract. The plaintiff emphasizes the following two sentences from these paragraphs:

"Continuation of the contract beyond the initial fiscal year will be at the discretion of the state. Termination may be effected by the state based upon determining factors such as unsatisfactory performance or the determination by the state to discontinue the goods/services, or to revise the scope and need for the type of goods/services; also management owner determinations that may preclude the need for goods/services."

The plaintiff argues that "the only way to interpret" this language is "to create a limited time and cause requirement that resembles a probationary period." The plaintiff contends that the state could avail itself of this termination clause only within the first fiscal year of the contract. According to plaintiff, the trial justice's interpretation of the contract allowed the state to "unilaterally void the contract at any time and for any reason, or for no reason whatsoever," rendering the agreement illusory. The plaintiff also argues that the trial justice's interpretation caused another clause in the contract, which reads "This is a multi-year bid/contract," to be mere "surplusage" because the state could cancel at any time. The plaintiff further contends that "[i]n order to properly terminate [JPL] for reasons or at times other than as specified in the Contract, the State should have been required to establish 'material breach.'" The plaintiff argues that the trial justice erred by applying a "good faith" standard rather than a material breach standard.

The state, for its part, argues that the trial justice correctly interpreted the contract to allow for lawful termination at the state's discretion after the initial fiscal year. The state further argues that each of its articulated reasons for the termination—unsatisfactory performance and failure to provide documentation—provided an independent justification for termination. The state also contends that the trial justice correctly found that the state exceeded its good faith obligations because it articulated reasons for terminating the contract, and because plaintiff failed to prove that the state acted in bad faith.

- 12 -

We begin by addressing plaintiff's allegation that the trial justice's interpretation of the contract rendered it illusory. "It is a fundamental principle of contract law that a bilateral contract requires mutuality of obligation." Centerville Builders, Inc. v. Wynne, 683 A.2d 1340, 1341 (R.I. 1996). "This mutuality is achieved when both parties are 'legally bound through the making of reciprocal promises.'" Id. (quoting Crellin Technologies, Inc. v. Equipmentlease Corp., 18 F.3d 1, 7-8 (1st Cir. 1994) (applying Rhode Island law)). The words of a promise "are illusory if they are conditional on some fact or event that is wholly under the promisor's control and bringing it about is left wholly to the promisor's own will and discretion," such that "the words used do not in fact purport to limit future action in any way." 2 Corbin on Contracts, § 5.32 at 175, 176 (1995). Generally, "termination clauses supported by adequate consideration are not illusory, but if a termination clause allows a party to terminate at any time at will without more, that promise is illusory." Holliston Mills, Inc. v. Citizens Trust Co., 604 A.2d 331, 335 (R.I. 1992).

In this case, JPL agreed to provide transportation services upon the state's request. In return, the state agreed to compensate JPL at the contractual rate. In addition, JPL agreed to abide by the state's requirements set forth in the contract for the manner in which it was to conduct its transportation services, and JPL agreed to provide the state with certain documentation. The state's termination rights were also a part of this bargain. Pursuant to the contract's unambiguous language, the state retained the discretion to discontinue the contract after the initial fiscal year, with "unsatisfactory performance" listed as one potential cause for termination. Thus, we agree with the trial justice's finding that, "according to the clear language of the Contract, it was the intention of the parties to allow the State to end requests for livery services and to terminate the contractual relationship with JPL under appropriate conditions."

- 13 -

We are of the opinion that the contract's termination language does not render the agreement illusory, because the state was not permitted "to terminate at any time at will without more." See Holliston Mills, Inc., 604 A.2d at 335. Rather, the state was obligated to maintain the contractual relationship throughout the first fiscal year and was further obligated to continue to compensate JPL for its services at the agreed-upon rate as long as the contract remained in force thereafter. We think it is clear that the phrase "This is a multi-year bid/contract," along with the contract's stated "effective period" of July 1, 2005 to June 30, 2010, merely set a time limit at the end of which the overall agreement would expire.

Furthermore, we are satisfied that this agreement provided mutuality of obligation because the state was statutorily required to exercise good faith in carrying out its contractual relationship with JPL. See G.L. 1956 § 37-2-3(b) (providing that "[e]very contract or duty under [chapter 2 of title 37] shall impose upon both parts the obligation of good faith in its performance and/or enforcement").[7] In this context, "good faith" is defined as "honesty in fact in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing." Id. Thus, the state could not terminate the contract upon a mere claim of dissatisfaction; it was obligated to exercise its termination rights with honesty and commercial reasonableness.

---

[7] According to G.L. 1956 § 37-2-4,

> "[Chapter 2] shall apply to every expenditure of public funds by any state governmental entity except as otherwise provided by law, by this state, or a public agency under any contract or like business agreement, excepting only those contracts or like business agreements where the state purchases goods or services from its political subdivisions or other governmental entities."

Additionally, the state referred to this chapter in its contract with JPL, which stated: "Per Rhode Island state law 37-2-33, contract obligations beyond the current fiscal year are subject to availability of funds."

The state terminated its contract with JPL in December 2007, more than two years after the agreement came into effect, and the termination letter provided JPL with three examples of "violations" that had occurred during the contract period: background checks on six JPL employees revealed criminal records; JPL had taken more than its allotted one hour to arrive at the locations of two decedents; and JPL had transported a child in arms rather than on a carrier. In addition to these enumerated violations, the state had communicated to Pilosa various complaints about JPL's services throughout 2007 and had repeatedly warned that the contract could be terminated.

The trial justice addressed plaintiff's argument that "the termination was an extension of O'Donnell's alleged 'vendetta' against JPL," and concluded that "JPL provided no credible evidence that the State or its employees demonstrated any bad faith at all towards JPL in the time period leading up to termination of the Contract." After reviewing the record, we perceive nothing to indicate that the trial justice was clearly wrong, and we do not find that she misconceived or overlooked material evidence in her determination that the state was honest and reasonable in the exercise of its contractual relationship with JPL. We concur with the trial justice's determinations that the contract was not illusory, and that the state did not breach the agreement by exercising its right to terminate upon a finding of unsatisfactory performance.

## C

### Alleged Factual Errors

The plaintiff also contends that the trial justice made errors in her findings of fact. The plaintiff argues that the trial justice relied on alleged wrongdoing that occurred during a previous contract period to establish JPL's poor performance, and that each alleged act should have been considered separately to determine whether it constituted a breach. The plaintiff further argues

that the trial justice erred by determining credibility in favor of Moynihan and O'Donnell, and against two other OME employees, Carl Zambrano and Angela Harwood.[8]

The trial justice in this case produced a thorough, well-written decision that clearly explained her findings of fact and credibility determinations. She found that JPL's performance during the contract period supplied the state with legitimate reasons for dissatisfaction, including the failure to provide a background check for one of its employees and the discovery that multiple JPL employees had extensive criminal records. The record reveals additional reasons for the state's dissatisfaction with JPL's services, including the incident with the mislabeled toe tag, the removal of a deceased child in arms rather than on a carrier, and JPL's tardiness in supplying insurance documentation. We cannot say that the trial justice was clearly wrong in finding that these incidents of misconduct were sufficient to cause the state to be dissatisfied with JPL's performance.

Additionally, the trial justice found Moynihan's and O'Donnell's testimonies "relating to the cost-cutting measures and dissatisfaction with JPL's services" to be "extremely credible." On the other hand, the trial justice gave "little weight" to Harwood's testimony and noted that Zambrano "had a history of disputes with O'Donnell as he had previously filed two complaints against the Chief Medical Examiner." After giving the trial justice's credibility findings the

---

[8] Angela Harwood worked as a "medicolegal death scene investigator" and was responsible for calling the livery service after determining that a body would have to be transported to the OME. Harwood also testified that she worked with JPL on scene and had no complaints about its services. Harwood, however, had never read the contract at issue in this case, was not familiar with its terms, and did not know whether JPL's performance complied with the contract's requirements. Carl Zambrano also worked as an investigator for the OME in 2006. He testified that it was his policy to grant permission for JPL to make additional stops after picking up a body and before returning to the OME. Zambrano also testified that he had filed an informal complaint against O'Donnell in early 2006, in part because of the policy that changed JPL's on-call hours for transportation services, and in part because, according to Zambrano, O'Donnell "was very hard to deal with," was untrustworthy, and was causing low morale within the agency.

"great weight" that they are due, we have no reason to disturb them on appeal. See Cullen, 15 A.3d at 976.

## IV

## Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be returned to the Superior Court.


**TITLE OF CASE:**      JPL Livery Services, Inc. d/b/a Ocean State Transfer v. Rhode Island Department of Administration et al.

JPL Livery Services v. State of Rhode Island et al.

**CASE NO:**      No. 2013-119-Appeal.
(PC 08-8293)

No. 2013-120-Appeal.
(PC 06-2570)

**COURT:**      Supreme Court

**DATE OPINION FILED:**      April 17, 2014

**JUSTICES:**      Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**      Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**      Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Brian P. Stern

**ATTORNEYS ON APPEAL:**

For Plaintiff:  Eric H. Miller, Esq.

For Defendant:  Jacqueline G. Kelley
                            Department of Health and Human Services

                            Adam J. Sholes
                            Department of Attorney General