**Supreme Court**

No. 2011-262-Appeal.

(KP 07-1217)

In re Estate of Ann Marie Picillo et al.      :

NOTICE:     This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re Estate of Ann Marie Picillo et al.    :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Goldberg, for the Court.**   This case came before the Supreme Court on September 24, 2014, on appeal by Michael J. Picillo (contestant) from a Superior Court judgment, declaring that the heirs-at-law[1] of Ann Marie Picillo (the decedent or the testatrix) failed to prove that the testatrix lacked testamentary capacity to execute a will and failed to prove that the will was the product of undue influence.  The contestant, who appeared before the Court pro se, asserts that the trial justice erred by:  (1) failing to consider whether the will was executed in compliance with G.L. 1956 § 33-5-5; (2) concluding that the will was not the product of undue influence; (3) finding the decedent had the requisite testamentary capacity to execute the will; and (4) failing to make appropriate findings of fact required by Rule 52(a) of the Superior Court Rules of Civil Procedure.  Because we are of the opinion that the trial justice committed no error, we affirm the judgment.

---

[1] Originally eight of the decedent's heirs-at-law—Beatrice Picillo, Cathy Picillo, Kenneth T. Picillo, Jr., Michael J. Picillo, Raymond Picillo, Jr., Robert S. Picillo, Warren Picillo, and Mariann DelFino—appealed the Probate Court decision.  However, only Michael, contestant, has appealed the Superior Court judgment.

- 1

**Facts and Travel**

On November 11, 2004, the decedent executed her last will and testament. She died on November 21, 2004. The decedent never married and had no children; she was predeceased by four brothers, her only siblings. The heirs-at-law consisted of the decedent's nieces and nephews, including contestant, for whom, the record revealed, she had little or no regard. In accordance with her oft-spoken direction, the will bequeathed nothing to the heirs-at-law. Rather, the will named Maria Christina Castellanos Muriel (Muriel or proponent), her in-home caregiver, and Richard L. Walsh, III (Attorney Walsh), her long-time attorney, as co-executors; devised to Muriel her home and a rental property next door; and bequeathed certain bank accounts as well as the remainder of her estate to Diane Munroe (Munroe), her long-time friend and former neighbor.[2]

On December 6, 2004, a petition for probate of the decedent's will was filed in Warwick Probate Court. After a lengthy contest that challenged the validity of the instrument, the will was admitted to probate on October 4, 2007. The contestant, along with the remaining heirs-at-law, timely appealed to the Superior Court, alleging that at the time she executed the instrument, the testatrix lacked testamentary capacity and that the will was procured by the undue influence of Muriel and Munroe.

A Superior Court bench trial was held in November and December 2010. Attorney Walsh, the attorney who drafted the will and was named as co-executor, testified that he had represented the decedent in legal matters from 1986 until her death. Attorney Walsh averred that he began discussing the decedent's will with his client in 1993 and did so again in 2003. He noted that, by 2003, the testatrix was bedridden and that, in 2004, her leg was amputated.

---

[2] Although the will included bequests to others, those provisions are not relevant to this opinion.

Attorney Walsh testified that the testatrix indicated to him on more than one occasion that she did not want her nieces and nephews to receive anything from her estate. He testified that, on October 18, 2004, he met with the decedent to discuss her estate plans and that, on that occasion, she made several changes to the draft he had been preparing. During that meeting, the testatrix told him that, in addition to rheumatoid arthritis, she had been diagnosed with a respiratory disease and expected to live for only three or four months. This diagnosis, according to Attorney Walsh, was the reason she desired to finalize her will. Based on that discussion, Attorney Walsh prepared another draft of the will and delivered it to the decedent on October 27, 2004.

Attorney Walsh also testified about the decedent's relationship with Muriel. According to Attorney Walsh, Muriel had been in and out of the room during the October 18, 2004 meeting, and he observed what he characterized as an "employer[-]employee relationship" between the decedent and Muriel. Attorney Walsh also discussed conversations he had with the decedent concerning Muriel. The testatrix disclosed that, over the last year and a half of her life, she had grown to have great affection for Muriel, who had provided her with considerable care, such that she had come to consider Muriel and her two sons as her family.

Next, Attorney Walsh testified that, on November 10, 2004, the testatrix contacted him and requested that he come to her house the following day in order to finalize her will. Although he initially was unavailable on November 11, 2004, Attorney Walsh did see his client that evening. Attorney Walsh testified that he met with his client—in private—for twenty to thirty minutes; that he found her to be alert, awake, and speaking clearly; and that she did not appear to be under the influence of any medication. He then left to finalize the will and returned with three witnesses. The testatrix executed the will that night. Attorney Walsh testified that it was his belief that the testatrix had the requisite testamentary capacity to execute the will and that he did

not consider her to be under duress or subject to the undue influence of anyone, including Muriel and Munroe.

Two of the three subscribing witnesses to the will also testified at trial, Steven Pagano (Pagano) and Attorney Walsh's mother, Nancy Walsh (Mrs. Walsh).[3] Both Pagano and Mrs. Walsh testified that the decedent's responses during the reading of the will were clear and that she did not appear to have problems understanding Attorney Walsh when he read the will to her. Both Pagano and Mrs. Walsh stated that they heard the decedent answer "yes" to all of Attorney Walsh's questions and that each witnessed her execute the will in their presence.

Next, Jane Illuzzi (Mrs. Illuzzi), a hospice nurse who made regular visits to the decedent's home in November of 2004, testified. According to Mrs. Illuzzi, the testatrix had expressed to her how happy she was to have Muriel caring for her. Mrs. Illuzzi also testified that the decedent told her that she did not want her own family to take anything from her estate and that she wanted to name Muriel as one of the beneficiaries. Lastly, Mrs. Illuzzi testified about the events of November 11, 2004. She stated that, although morphine had been administered that day, the testatrix nonetheless appeared alert and oriented and was never delirious.

Mrs. Illuzzi's daughter-in-law, Erin Illuzzi (Attorney Illuzzi), also testified at trial. Apparently, Attorney Illuzzi had been summoned by the decedent on November 11, 2004 when she was unable to reach Attorney Walsh. Attorney Illuzzi testified that she met with the decedent for the first time at 2 p.m. on November 11, 2004, to discuss her will and that, during this meeting, the decedent understood her questions, answered them appropriately, and did not appear to be under the influence of any type of medication. Attorney Illuzzi also stated that the decedent had disclosed to her that she did not care for her nieces and nephews and that they were

---

[3] The third witness to the execution of the decedent's will, Richard L. Walsh, Jr., did not testify at trial; he had passed away.

to receive nothing. However, Attorney Illuzzi also testified that, after having met with her for almost three hours, the testatrix began to tire and "gradually break down" and had trouble answering her questions. She testified that, during her meeting with the decedent, Muriel and Munroe tried to remind the decedent of specific items and accounts that she had told them she would leave to them. Attorney Illuzzi testified that, at that point, she had questions about the decedent's capacity and decided to leave, but she added that she had been willing to return later that evening or the next morning to finalize the will. Hillary Sullivan (Sullivan), a paralegal, was also at the November 11, 2004 meeting between Attorney Illuzzi and the decedent, and she testified—by way of deposition—that the decedent had been in a daze and had trouble answering questions during the entire meeting, not just at the end.

Doctor James Burrill (Dr. Burrill) testified as an expert witness on behalf of the heirs-at-law. Having reviewed the decedent's hospice records, Dr. Burrill testified about the effects of morphine the testatrix received in the twenty-four hours prior to November 11, 2004. According to Dr. Burrill, based on the amount of morphine the decedent purportedly was administered— three doses in a twenty-four-hour span—it was his opinion that she would have been delirious when she executed her will.

Muriel testified next and discussed, among other things, her first-hand knowledge that the amount of morphine set forth in the decedent's hospice records had not been administered to the testatrix and that she had never been given more than one dose in a day.[4] Muriel described her relationship with the decedent as having grown from that of an employer-employee to a personal and caring relationship. By November 2004, Muriel was paying rent and living in an apartment

_____

[4] There was testimony that the decedent would be forced from her home and into a hospice facility if she was not given morphine; thus, as the decedent wished to remain in her home, Muriel and Munroe recorded in the decedent's hospice records that she received more morphine than the amount that actually had been administered.

owned by the decedent.  She was caring for the decedent daily, including family dinners with her family and the decedent on a nightly basis.

Lastly, Munroe, the decedent's former neighbor and long-term friend, testified.  Her testimony corroborated that of Muriel concerning the amount of morphine administered in the twenty-four hours preceding the execution of the will.  Munroe also testified about the relationship between the testatrix and Muriel, stating that she thought the decedent loved Muriel like a daughter.  She also testified about the decedent's demeanor on November 11, 2004, stating that she appeared to understand everything that took place when she executed the will.

The trial justice issued a written decision and found that the decedent had the requisite testamentary capacity when she executed the will and that the will was not the product of undue influence.  The contestant appealed.

### Standard of Review

"According to our well settled 'raise[-]or[-]waive' rule, if an issue was not preserved by specific objection at trial, then it may not be considered on appeal." State v. Pona, 66 A.3d 454, 468 (R.I. 2013) (quoting State v. McManus, 990 A.2d 1229, 1237 (R.I. 2010)).  "We require a specific objection so that the allegation of error can be brought to the attention of the trial justice, who will then have an opportunity to rule on it." Id.

Additionally, "[i]t is well established that the factual findings of a trial justice sitting without a jury are accorded great weight and will not be disturbed unless the record shows that the findings clearly are wrong or the trial justice overlooked or misconceived material evidence." Process Engineers & Constructors, Inc. v. DiGregorio, Inc., 93 A.3d 1047, 1051 (R.I. 2014) (quoting Wellington Condominium Association v. Wellington Cove Condominium Association, 68 A.3d 594, 599 (R.I. 2013)).  "If, as we review the record, it becomes clear to us that 'the

record indicates that competent evidence supports the trial justice's findings, we shall not substitute our view of the evidence for [his or hers] * * *.'" Id. at 1052 (quoting Wellington Condominium Association, 68 A.3d at 599).

## Analysis

### Statutory Requirements

First, contestant argues that proponent failed to establish that the will was executed according to the requirements of § 33-5-5 of the General Laws. Although contestant acknowledges that evidence was submitted to the trial court that the subscribing witnesses were present when the decedent executed the will, he contends that this testimony was not specific enough to satisfy the statutory requirements of § 33-5-5 and that, therefore, proponent failed to establish that the subscribing witnesses were actually "in the presence" of the testatrix and each other when she executed the will. The contestant asserts that the decision was "absolutely silent with respect to [this] issue" and that the trial justice erred in failing "to make a finding of fact that there was indeed compliance with" § 33-5-5.

The proponent responds that this issue was not litigated in the Probate Court or the Superior Court. Nevertheless, proponent submits that sufficient evidence was produced to satisfy the requirements of § 33-5-5. The proponent points to the testimony of Attorney Walsh and two of the subscribing witnesses, Pagano and Mrs. Walsh, as establishing that: (1) when the will provisions were read to the decedent, the decedent agreed to each provision; (2) the decedent signed the will herself in the presence of both Pagano and Mrs. Walsh; and (3) Pagano and Mrs. Walsh also signed the will in the presence of the decedent and each other. Lastly, proponent contends that the trial justice made sufficient factual findings as to the proper execution of the will in his written decision to defeat this issue.

After careful review of the record in this case, we are satisfied that the issue of whether the will was executed in accordance with § 33-5-5 was not argued to the trial justice. Although in their reasons for appeal to the Superior Court the heirs-at-law alleged that the will "was not executed according to the requisite statutory formalities[,]" neither side raised this issue to the trial justice. The focus of the trial was limited to the issues of undue influence and testamentary capacity, as set forth by counsel in their opening statements to the trial justice. Nonetheless, we shall proceed to address this question.

Section 33-5-5 provides in relevant part:

> "No will shall be valid * * * unless it shall be in writing and signed by the testator, or by some other person for him or her in his or her presence and by his or her express direction; and this signature shall be made or acknowledged by the testator in the presence of two (2) or more witnesses present at the same time, and the witnesses shall attest and shall subscribe the will in the presence of the testator, but no form of attestation shall be necessary, and no other publication shall be necessary."

"Under our law, if [a] will has been signed by [the] testator and the required number of witnesses, there is a presumption that the statutory requisites for executing a will have been met." Lett v. Giuliano, 35 A.3d 870, 877 (R.I. 2012). "The burden of proof in a will contest is a preponderance of the evidence." Pollard v. Hastings, 862 A.2d 770, 776 n.3 (R.I. 2004).

There is nothing in the record before us that casts any doubt that the requirements set forth in § 33-5-5 were not met. No witness or piece of documentary evidence even suggests that the will was not executed according to the formalities of the statute. Although the trial justice failed to state specifically that the statutory formalities were met, he did make factual findings that satisfied the statutory requirements. The trial justice found the testimony of Attorney Walsh to be "credible in its entirety[,]" noting that Attorney Walsh had "twenty-four years of experience[] and had completed upwards of two hundred wills." Attorney Walsh testified that he

read the will aloud to the decedent, watched her sign the will, and then observed Pagano and Mrs. Walsh sign the will in the decedent's presence and in the presence of each other. The trial justice also noted that both subscribing witnesses testified that they observed Attorney Walsh read the will, observed the testatrix acknowledging the portions read aloud to her, and witnessed her signing the will. There was no evidence to the contrary and nothing before the Court that would overcome the presumption of validity.

A trial justice sitting without a jury need not "make findings with respect to every witness or issue in which 'a full understanding of the issues' and the conclusions of the fact finder 'may be reached without the aid of separate findings.'" Donnelly v. Cowsill, 716 A.2d 742, 747 (R.I. 1998) (quoting Anderson v. Town of East Greenwich, 460 A.2d 420, 423-24 (R.I. 1983)). Accordingly, we reject the argument that the execution of the will was not in accordance with § 33-5-5.

### Undue Influence

Next, contestant argues that the trial justice erred in rejecting the claim that the will was procured by undue influence. Our review of the record reveals that the trial justice conducted the correct analysis; he reviewed the testimonial and documentary proof, weighed the evidence, passed on the credibility of the witnesses, and found that the will was not the product of undue influence.

Undue influence is the "substitution of the will of [the dominant] party for the free will and choice [of the subservient party]." Filippi v. Filippi, 818 A.2d 608, 630 (R.I. 2003) (quoting Tinney v. Tinney, 770 A.2d 420, 437-38 (R.I. 2001)). When determining what constitutes undue influence, "a trial justice ordinarily examines the totality of [the] circumstances, including the relationship between the parties, the physical and mental condition of the [subservient party], the

opportunity and disposition of [the] person wielding influence, and his or her acts and declarations." Id. (quoting Tinney, 770 A.2d at 438). "The question of whether undue influence exists is a fact-intensive inquiry." Id. (citing Tinney, 770 A.2d at 438).

In his decision, the trial justice properly noted that "not all influence is undue" and that only undue influence will serve to invalidate a will and must amount to "the substitution of the will of a third party for the free will and choice of the testator * * *." Caranci v. Howard, 708 A.2d 1321, 1324 (R.I. 1998). The trial justice explored the nature and depth of the decedent's relationship with Muriel and Munroe as support for her decision to leave the bulk of her estate to them rather than the heirs-at-law. He recounted Attorney Walsh's testimony about the decedent's personality and what the trial justice concluded was the "strength of her character." The trial justice referenced Attorney Walsh's testimony describing the relationship between the decedent and Muriel "as strictly an employer[-]employee relationship, with [Muriel] acting solely at [the decedent's] direction." The trial justice also found that Attorney Walsh's characterization of the relationship between the testatrix and Muriel was supported by Muriel's own testimony, which he found to be credible. The trial justice also noted Muriel's demeanor during her testimony, including her emotional reaction to a photo of the decedent and the testimony from other witnesses[5] who recounted the decedent's praise for Muriel. He declared "that there existed a true and sincere caring relationship between them, and that their emotional attachment to one another went beyond the bounds of their employer[-]employee relationship." Addressing the decedent's friendship with Munroe, the trial justice noted the long, "very close" relationship the two had since becoming neighbors in the 1980s.

---

[5] The trial justice noted that Attorney Walsh, Mrs. Illuzzi, and Munroe were the witnesses who corroborated Muriel's testimony regarding the depth of her relationship with the decedent.

The trial justice then remarked on the "stark contrast" between the testatrix's relationships with Muriel and Munroe and her antipathy toward her nieces and nephews. He noted that witness testimony revealed that the decedent harbored an "intense animosity towards her entire family" and cited two specific instances that explained why she decided to leave them nothing.[6] Lastly, the trial justice rejected the argument that Attorney Illuzzi's testimony that Muriel and Munroe had encouraged the decedent to remember certain dispositions established undue influence, stating that there was other testimony that the decedent already had committed to making those dispositions, thus establishing that they were not substituting their will for that of the decedent's.

After careful review, we are satisfied that the trial justice made sufficient findings of fact and that he did not overlook or misconceive material evidence nor was he clearly wrong in rejecting the claim of undue influence.

## Testamentary Capacity

The contestant next assigns error to the finding that the decedent possessed the requisite testamentary capacity when she executed the will. Our assessment of the record reveals that the trial justice conducted a proper analysis of the evidence and controlling law and declared that he agreed with the findings of the Probate Court that the decedent was of sound mind and possessed testamentary capacity when she executed the will.

---

[6] The first incident occurred when contestant was living with the decedent. Apparently, the decedent had asked contestant to leave her food in the mornings, but contestant failed to do so, necessitating a call to a friend who stopped by every morning to feed her. The second and more egregious incident occurred when the decedent's niece was living with her. The niece left the decedent's home on a Friday evening and did not return for the entire weekend—leaving her immobile and without any food or means to move about her home. The decedent finally contacted another family member to come tend to her on Sunday morning, finding a famished decedent greatly in need of personal care.

"It is well-settled that in a will contest, the proponent of the will bears the burden of proof of testamentary capacity by a fair preponderance of the evidence." Pollard, 862 A.2d at 777. Also well-established is the test for testamentary capacity, which requires that, at the time the will is executed, the testatrix,

> "has sufficient mind and memory to understand the nature of the business [s]he is engaged in when making h[er] will[;] has a recollection of the property [s]he wishes to dispose of thereby[;] knows and recalls the natural objects of h[er] bounty, their deserts with reference to their conduct and treatment of h[er], [and] their necessities[;] and the manner in which [s]he wishes to distribute h[er] property among them." Rynn v. Rynn, 55 R.I. 310, 321, 181 A. 289, 294 (1935).

In the case before us, contestant argues that the testimony of Attorney Illuzzi and Dr. Burrill established that the decedent lacked testamentary capacity at the time she executed her will. The contestant points to Attorney Illuzzi's testimony that, several hours into her visit with the decedent, she concluded that the decedent lacked testamentary capacity as conclusive evidence that later that evening when the decedent executed the will she also lacked the capacity to do so. The contestant also contends that Dr. Burrill's testimony, derived from the hospice records of morphine doses set forth in the medical chart, was proof that she lacked capacity.

The trial justice specifically addressed this evidence in his decision, but he assigned greater weight to the testimony of Attorney Walsh, the testatrix's long-time attorney and whose testimony was corroborated by other contemporaneous witnesses. Attorney Walsh testified that he believed the decedent had testamentary capacity during the will execution on November 11, 2004. The trial justice also was persuaded by Munroe's testimony that the decedent had not received morphine in the time period before she executed the will. He also noted that "[e]ven if [the decedent] had taken morphine at some point during the previous day, the testimony of Attorney Walsh and of the witnesses to the will's execution convince[d him] by a fair

- 12 -

preponderance of the evidence that [the decedent] had testamentary capacity at the time she signed her will." We accord great weight to the factual findings and conclusions of a trial justice sitting without a jury. JPL Livery Services, Inc. v. Rhode Island Department of Administration, 88 A.3d 1134, 1141 (R.I. 2014).

In this case, it is apparent that the trial justice made sufficient findings of fact, evaluated the testimony, and was not clearly wrong in his conclusion that the decedent possessed the requisite testamentary capacity to execute a will on November 11, 2004.

## Rule 52(a)

Lastly, contestant argues that the trial justice failed to make sufficient findings of fact to support his written decision. "Rule 52(a) * * * requires a trial justice in a nonjury case to 'find the facts specially and state separately its conclusions of law thereon * * *.'" JPL Livery Services, Inc., 88 A.3d at 1141 (quoting Rule 52(a)). However, the trial justice "need not engage in extensive analysis to comply with this requirement." Id. (quoting Connor v. Schlemmer, 996 A.2d 98, 109 (R.I. 2010)). "[I]f the decision reasonably indicates that [the trial justice] exercised [his or her] independent judgment in passing on the weight of the testimony and the credibility of the witnesses it will not be disturbed on appeal unless it is clearly wrong or otherwise incorrect as a matter of law." Id. (quoting Notarantonio v. Notarantonio, 941 A.2d 138, 144-45 (R.I. 2008)).

The findings of fact in the decision before us on appeal adequately addressed the controlling issues. The trial justice appropriately reviewed and weighed the evidence and made factual findings and conclusions of law. We therefore discern no merit in contestant's argument that the trial justice failed to make the necessary findings of fact to support his written decision. See JPL Livery Services, Inc., 88 A.3d at 1141.

## Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be returned to the Superior Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**  In re Estate of Ann Marie Picillo et al.

**CASE NO:**  No. 2011-262-Appeal.
(KP 07-1217)

**COURT:**  Supreme Court

**DATE OPINION FILED:**  February 15, 2014

**JUSTICES:**  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**  Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:**  Kent County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Daniel A. Procaccini

**ATTORNEYS ON APPEAL:**

For Contestant:  Michael J. Picillo, Pro Se

For Proponent:  Jessica L. Basso, Esq.