Stephen G. SARKISIAN and Karen Sue Schmalzbach

v.

The NEWPAPER, INC. and Tyler Davis, Jr.

No. 83–591–Appeal.

Supreme Court of Rhode Island.

July 3, 1986.

Reargument Denied July 17, 1986.

Edward N. Beiser, Michael Kevin Marran, Michaelson Stanzler & Biener, Providence, for plaintiffs.

Thomas G. Hetherington, Pawtucket, for defendants.

## OPINION

MURRAY, Justice.

This case involves an appeal by Stephen G. Sarkisian (Sarkisian) and Karen Sue Schmalzbach (Schmalzbach), the plaintiffs, arising out of a civil action for, inter alia, fraud and conversion that they commenced against the NewPaper, Inc. (NewPaper), and Tyler B. Davis, Jr. (Davis), the defendants. Initially, the jury returned a verdict in the plaintiffs' favor, including an award of punitive damages in the amount of $18,-333 for each plaintiff on the fraud count. Subsequently, however, the trial judge determined in ruling on the defendants' motion for a new trial that punitive damages were not warranted by the evidence presented. Pursuant to this decision, the trial justice ordered a new trial solely on the issue of punitive damages unless the plaintiffs accepted a remittitur of all such damages. In response to this judgment, the plaintiffs appealed to this court.[1] The sole issue before us is predicated on the following facts.

In the summer of 1977 plaintiff Sarkisian decided to pursue in earnest his lifelong ambition of creating and publishing an alternative weekly newspaper in Rhode Island. In accordance with this professional

---

1. Apparently, defendants also appealed to this court from the judgment of the trial court. A thorough examination of the record, however, reveals that defendants never filed a notice of appeal as required by Rule 3 of the Supreme Court Rules. At oral argument, defendants' counsel insisted that he did file a notice of appeal on or about August 19, 1983. Unfortunately, this assertion is not borne out by the record before us. We reiterate that there is no evidence or documentation in the record to indicate that defendants filed a notice of appeal in this case. This court has recently stated that the timely filing of a notice of appeal as prescribed by Rule 3 of our rules is mandatory. *Hood v. Hawkins,* 478 A.2d 181, 184 (R.I.1984). The defendants' failure to comply with the provisions of Rule 3 deprives Davis and NewPaper of any opportunity to have this court consider the issues raised by them. *Id.* Furthermore, even if we were to excuse this particular procedural deficiency and reach the merits of defendants' claims on their cross-appeal, our examination of the record indicates that we would find the arguments raised by them to be meritless. We emphasize that the only parties properly before us are plaintiffs Sarkisian and Schmalzbach.

and personal desire, he engaged in several lengthy discussions with both plaintiff Schmalzbach and defendant Davis concerning the formation of the paper. Eventually, on or about January 31, 1978, these conversations culminated in an agreement between plaintiffs and defendant Davis to produce a weekly newspaper called "The NewPaper," which would focus on arts and entertainment and be solely financed through advertising. At the trial, a considerable dispute arose between plaintiffs and defendant Davis regarding the other terms of this initial agreement.

Both plaintiffs testified that even though Davis put up all the money for the venture ($15,000), they believed that all three of them were equal partners.[2] To support this position plaintiffs advocated that each member of the partnership brought his or her own expertise and experience to the paper, the aggregate of which would be essential to ensuring that the business got off the ground. The record discloses that Sarkisian had some experience as a journalist, while Schmalzbach had a good background in the arts.[3] In addition, since they had previously worked in the advertising department at another similar newspaper, they brought to the NewPaper their expertise in this particular area plus a broad base of business clients, both of which would be essential to the survival of a paper financed solely by advertising proceeds. The plaintiffs also alleged that they and Davis agreed to have each partner receive $225 a week, $100 of which would be drawn as salary, and the remainder deferred. With respect to the amount deferred, two methods of compensation that would pose the least risk to the enterprise were agreed to, according to plaintiffs, by both them and Davis. First, presuming the newspaper flourished financially, each partner would be reimbursed in cash to whatever extent possible from the profits realized. Alternatively, each partner would receive stock equivalent to the compensation deferred at some future date once the business was incorporated. Both plaintiffs stressed that although the subject of incorporation had been discussed among themselves and Davis before and after the NewPaper's formation, no agreement had been reached about incorporating the business.

In refuting plaintiffs' allegations, Davis contends that he understood the nature and terms of the agreement to be in the form of a limited partnership with himself as the dominant general partner and plaintiffs as limited partners.[4] In light of the fact that he was exclusively financing the project, Davis reasoned that he believed his position within the infrastructure of the NewPaper to be that of a controlling general partner. Davis insisted that he possessed ultimate control over the newspaper and that if he and the other partners could not agree on a matter concerning the paper, he had the overriding authority to make a final decision that would be binding on all the partners. In addition, Davis claimed that he and plaintiffs never reached an agreement as to the precise amount of compensation that would be deferred, although he acknowledged that they had agreed to permit each partner to draw $100 a week as salary. He also emphasized that there was never any consensus reached with respect to each partner's receiving a cash distribution from the profits as reimbursement for deferred compensation. The only agreement made between them concerning the deferred salary, according to Davis, was that each partner would accept stock in lieu of cash.

---

**2.** We note for purposes of clarification that although Davis primarily financed the business, both plaintiffs testified that they were equally responsible for the debts and liabilities of the newspaper.

**3.** Aside from his disposable income, defendant Davis had considerable experience in the area of journalism as well, including some freelance work for the Providence Journal-Bulletin.

**4.** Davis also contended that there was a fourth partner, Michelle Demers, involved from the inception of this enterprise. Although Demers was employed by the NewPaper, the jury found that she was not a partner in the venture.

Returning to the chronology of the case, on March 8, 1978, the first issue of the NewPaper was published. The second issue of the NewPaper, dated March 22, 1978, reveals in its masthead section the following: Ty Davis—Editor; Steve Sarkisian—General Manager; and Karen Sue Schmalzbach—Advertising Manager. According to the testimony of the various people connected with or employed by the NewPaper, including plaintiffs, the decision-making process was conducted in fashion wherein the three partners met informally and reached determinations by means of a consensus.

Although the journalistic operation continued to run smoothly for a time, a rift eventually developed between plaintiffs and defendant Davis concerning what proved to be two controversial issues.

First, defendant Davis unilaterally incorporated the NewPaper on July 12, 1978, without first notifying plaintiffs or obtaining their approval of this particular action. Apparently, plaintiffs, both of whom had expended a great deal of time and energy in establishing and producing the paper, had no knowledge of the incorporation until they read about it in the Providence Journal-Bulletin. When plaintiffs confronted Davis about the incorporation, he countered that it was a necessary step for attracting investors and taking advantage of tax laws. Practicality aside, plaintiffs were extremely concerned that their respective interest and control in the paper had been jeopardized or altogether eliminated by Davis' single-handed transfer of the partnership assets to the corporation, of which Davis was president. Davis responded by assuring plaintiffs that his role as president was a mere formality and that the details, such as bylaws and the corporate structure, could be worked out among them and the attorneys at a later date. Despite this good-faith overture, however, and plaintiffs' repeated oral and written requests for more information regarding the incorporation, Davis neglected to provide any documentation about the matter.

Thereafter, plaintiffs discovered that Davis and his attorney had attended a shareholders' meeting of the NewPaper during the course of which Davis received 1,001 shares of no-par common stock for $27,500. Neither plaintiff had been invited to participate in the meeting. In September of 1978 both plaintiffs received one share of stock in NewPaper, which was delivered to them by Davis. Again, plaintiffs were concerned about their status as partners in the venture since other employees at the paper had received one share of stock in the NewPaper as well. Davis, however, placated their fears by informing them that more stock would be forthcoming. Needless to say, this promise too failed to materialize.

In spite of the incorporation and the uneasiness and friction it generated among plaintiffs and defendant Davis, the management of the newspaper continued to operate along the same initial format with all three partners meeting informally and deciding matters with a consensus vote. Meanwhile, in November or December of 1978, Davis, in an effort to keep the business solvent, managed to secure a loan in the amount of $10,000 from Hospital Trust. The record indicates that he was able to obtain an additional $20,300 on the same loan. Davis was also successful in procuring a $55,100 loan on behalf of the newspaper from his family.

The second issue which caused a great deal of consternation among the partners occurred in February of 1979. The focus of this controversy centered upon the continued employment of Michelle Demers, who was involved in typesetting and advertising sales at the NewPaper. According to plaintiffs' testimony, they were both in favor of terminating Demers' employment because, as Schmalzbach testified, she was not doing her job. Davis, who was dating Demers at the time, strongly disagreed with plaintiffs and insisted that she remain at the paper. Sarkisian testified that Davis began to assert his title as president in an effort that eventually succeeded in foiling

any attempt to terminate Demers' employment at the newspaper.

Shortly thereafter, in late February 1979, plaintiffs learned that Davis and Demers planned to take a trip to Hawaii for a vacation. Both plaintiffs did not think the trip was in the best interest of the paper since publication would be interrupted. Again, plaintiffs expressed concern over the incorporation issue. At this juncture, according to Schmalzbach's testimony, Davis reassured plaintiffs that he believed they were partners and that he was not trying to eliminate them from the partnership. He claimed that his busy workload had prevented him from producing the documentation that they had requested. Davis, however, promised that the details relative to the incorporation would be worked out and that he would prepare some preliminary papers for them during his vacation. Nevertheless, upon his return from Hawaii in early March 1979, Davis failed to provide plaintiffs with any information regarding the incorporation.

Becoming increasingly uncomfortable with their status at the NewPaper and the failure of Davis to cooperate in resolving the incorporation issue, plaintiffs wrote a memo to Davis outlining their understanding of the initial partnership agreement. This particular communication, dated March 14, 1979, and entered as a full exhibit at trial, also repeated plaintiffs' request for more information about the incorporation. Again, Davis failed to comply with plaintiffs' demands. As a result, tension between the partners escalated and several heated arguments took place among them, all of which precipitated in causing a detrimental impact upon the morale at the paper. Eventually, in June 1979 Davis took the initiative and informed Sarkisian that his employment at the paper had been terminated. A short time later, Schmalzbach left the NewPaper of her own accord.

Responding to this action taken by Davis, plaintiffs filed a suit against him and the NewPaper alleging, inter alia, that Davis had fraudulently appropriated their respective proprietary interests in the NewPaper. In regard to this particular fraud count, plaintiffs prayed for relief in the form of both compensatory and punitive damages. At the trial's conclusion, the jury found that plaintiffs and Davis were equal partners in the NewPaper. They also agreed with plaintiffs' interpretation of the deferred-compensation plan. A favorable verdict was also returned on the fraud count, including a punitive damage award in the amount of $18,333 for each plaintiff.[5] As noted earlier, the trial judge determined, in ruling on defendants' motion for new trial, that the evidence did not warrant an award of punitive damages. Accordingly, he ordered a new trial on the issue of punitive damages unless plaintiffs accepted a remittitur of all such damages. This determination by the trial judge, which plaintiffs contest, is the focal point of the issue before us.

In reviewing the merits of plaintiffs' claim, we are mindful that a trial justice's ruling on a motion for new trial will be afforded great weight and will not be disturbed unless he or she overlooked or misconceived material evidence or was otherwise clearly wrong in performing his or her function. *Hynes v. Rochford*, 474 A.2d 449, 451 (R.I.1984). Under Rhode Island law the duty of a trial justice in reaching a determination on a motion for a new trial is well established. The trial justice must review independently all of the material evidence in light of the charge to the jury, passing upon the weight of the evidence and assessing the credibility of witnesses. *Levcowich v. Town of Westerly*, 492 A.2d 141, 144 (R.I.1985).

If the trial justice then determines that the evidence and the reasonable inferences to be drawn therefrom are so nearly bal-

5. The jury awarded compensatory damages on the fraud count as follows: Sarkisian—$20,873, Schmalzbach—$22,333.

anced that reasonable persons could arrive at different results in deciding the case, the new-trial motion must be denied. If, however, the trial justice finds that the jury's verdict is against the fair preponderance of the evidence, he or she must grant the motion for a new trial. *Gibbs Oil Co. v. Potter,* 471 A.2d 207, 210 (R.I.1984). Although an exhaustive evaluation of the evidence is not required, the trial justice should at least refer with some specificity to the facts that prompted his or her action in order to enable this court to determine whether the decision was warranted. *Belanger v. Cross,* 488 A.2d 410, 412 (R.I. 1985); *Morinville v. Morinville,* 116 R.I. 507, 511–12, 359 A.2d 48, 51 (1976). For purposes of the discussion at hand, we note that the above-enunciated standard of review and duties are applicable when the question on the motion for a new trial involves the award of excessive damages. *Zarrella v. Robinson,* 460 A.2d 415, 418 (R.I.1983).

In contesting the trial justice's ruling on the new-trial motion, plaintiffs rely to a great extent on the novel proposition that once a trial judge determines that a case is appropriate for an award of punitive damages and instructs the jury accordingly, he or she is bound by the law of his or her instruction and cannot review the jury award of such damages. Granted, jury instructions that are not objected to become the law of the case and are binding on both the jury and the trial justice when he or she passes on a motion for new trial. *Zawatsky v. Cohen,* 463 A.2d 210, 212 (R.I. 1983). We also acknowledge that if a case is deemed appropriate by the trial justice for an award of punitive damages, the determination with regard to whether plaintiffs are entitled to such an award, and in what amount, is a matter left to the discretion of the jury. *Pimental v. Postoian,* 121 R.I. 6, 14, 393 A.2d 1097, 1102 (1978). We emphasize, however, that a jury's decision to award punitive damages is not insulated in all respects from further scrutiny

by the trial judge. *Zarrella,* 460 A.2d at 418–19.

Normally, punitive damages are awarded when there is " 'evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amount[s] to criminality, which for the good of society and warning to the individual, ought to be punished.' " *Morin v. Aetna Casualty and Surety Co.,* 478 A.2d 964, 967 (R.I.1984). Courts in this jurisdiction only allow punitive damages when the evidence indicates that the defendant acted maliciously or in bad faith. *Carvalho v. Coletta,* 457 A.2d 614, 616 (R.I.1983).

This court has articulated previously that it is well settled in this jurisdiction that although the fixing of damages is generally a jury function, it may be interfered with by a trial justice on a motion for a new trial if, in the exercise of his or her independent judgment in passing upon the evidence of damages, the trial justice finds that the award is grossly in excess of an amount adequate to compensate the plaintiff for the wrong done. *Mouchon v. Erikson's Inc.,* 448 A.2d 776, 779 (R.I.1982). Moreover, the trial judge may also set aside a jury award of punitive damages on a motion for new trial if the award "shocks the conscience or clearly demonstrates that the jury was influenced by passion or prejudice, or that it proceeded upon a clearly erroneous basis in arriving at its award." *Zarrella,* 460 A.2d at 418 (quoting *Wood v. Paolino,* 112 R.I. 753, 757, 315 A.2d 744, 746 (1974) ). Finally, a trial judge may also disregard a jury's award for punitive damages if he or she finds it to be manifestly against the weight of the evidence. *Zarrella,* 460 A.2d at 419. In examining the trial judge's decision to set aside the punitive-damage award in the instant action, we adhere to the principle that his or her determination should be given great persuasive force by us. *Id.*

At the new-trial hearing, the trial judge thoroughly examined the facts and evidence before him, including his charge to the jury. Quoting from a typed transcript

of his jury instructions, he set forth the standard that he provided to the jurors for determining punitive damages. The quoted standard was in full accord with the law in this jurisdiction. The trial judge then determined, relying on the evidence before him, that there was no wanton, malicious, or reckless conduct on the part of Davis that would warrant the assessment of punitive damages against him on the fraud charge. *See Holmes v. Bateson*, 434 F.Supp. 1365, 1390 (D.R.I.1977) (absence of evidence of extreme malice on part of defendants compelled court to hold that punitive damages were unwarranted), *aff'd in part and rev'd in part*, 583 F.2d 542 (1st Cir.1978). Conceding that plaintiffs and Davis did not see "eye to eye" on many aspects of their initial agreement of January 31, 1978, the trial judge noted, however, that the collective testimony of the partners indicated that they came to a consensus to incorporate at some point in the future. As noted earlier, plaintiffs vehemently denied that any agreement to incorporate had ever been made. Nevertheless, it seems evident from the record before us that since the partners had agreed to accept stock in lieu of the deferred compensation, a fact which neither side disputed, there was indeed some consensus reached relative to incorporating the business at some future date.

The record further indicates that since neither plaintiff was very knowledgeable about the business aspects of running the newspaper, such as incorporation and taxes, defendant Davis was given sole responsibility for those particular areas of the venture. Taking into account that the business aspects of the NewPaper had been entrusted to Davis, who believed he had the controlling authority over the venture, his act of unilaterally incorporating the business was simply, as the trial judge explained, a manifestation of his understanding of the agreement with the plaintiffs: a limited-partnership enterprise that would eventually be incorporated. According to the trial judge, "[Davis] was just carrying out what he understood the agree-

ment to be." We agree with the trial judge that although Davis' conduct was tortious, especially his failure over an eleven month period to resolve the incorporation issue with the plaintiffs, there is no evidence to suggest that he acted in such a malicious manner as to justify the imposition of a punitive damage award against him. There is no question in our considered judgment that the jury's award of punitive damages was manifestly against the weight of the evidence and, hence, clearly excessive. *Zarrella*, 460 A.2d at 419. As a result, we find that the trial judge did not overlook or misconceive material evidence, nor was he otherwise clearly wrong in granting a new trial on the issue of punitive damages unless the plaintiffs accepted a remittitur of all such damages.

Relying on the above reasoning, the plaintiffs' appeal is denied and dismissed. The judgment appealed from is affirmed, and the papers are remanded to the Superior Court.