June 28, 2019

**Supreme Court**

No. 2017-149-Appeal.
No. 2017-150-Appeal.
(PC 09-5006)

Wenda Branson          :

v.          :

Marion P. Louttit, individually and in her          :
capacities as Trustee of the Augusta P.
Hathaway Living Trust and Custodian for          :
Jonathan H. Louttit, II and Caroline
Hathaway Louttit, minor children.          :

NOTICE:  This opinion is subject to formal revision before publication in
the Rhode Island Reporter.  Readers are requested to notify the Opinion
Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence,
Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal
errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2017-149-Appeal.
No. 2017-150-Appeal.
(PC 09-5006)

Wenda Branson               :

v.               :

Marion P. Louttit, individually and in her    :
capacities as Trustee of the Augusta P.
Hathaway Living Trust and Custodian for   :
Jonathan H. Louttit, II and Caroline
Hathaway Louttit, minor children.     :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.** This protracted squabble among siblings reaches us after a decade of litigation. At issue are amendments to an *inter vivos* trust and gifts of interest in a family limited partnership that was established by Augusta Hathaway during the 1990s in an effort to limit the tax liability to her estate. A trial was held in December 2014, after which a jury found that Ms. Hathaway lacked the testamentary capacity to amend her trust and that the defendant, Marion Louttit, Ms. Hathaway's youngest daughter, had unduly influenced Ms. Hathaway, thereby causing Ms. Hathaway to execute the challenged amendments and gifts.[1] The jury also found that Marion Louttit had breached her fiduciary duty as trustee of the *inter vivos* trust. Following the jury's verdict, Louttit renewed her motion for judgment as a matter of law and moved for a new trial. After duly considering those motions, the trial justice denied Louttit's motion for new trial

---

[1] We note that Louttit's surname is spelled inconsistently throughout the record in this case. For the sake of consistency, we shall spell the surname as it appears in the parties' briefs.

and judgment as a matter of law on the claims of testamentary capacity and undue influence. However, the trial justice granted both motions as to the fiduciary duty verdict because, according to the trial justice, the plaintiff, Wenda Branson—Ms. Hathaway's middle daughter—had failed to prove damages. An order entered on February 4, 2016, to that effect, which also denied the plaintiff's motion for attorneys' fees. Judgment entered that same day, and the parties cross-appealed.[2] After carefully reviewing the parties' arguments and thoroughly examining the evidence presented at trial, we affirm the judgment of the Superior Court in all respects, and we vacate the grant of a new trial as to the plaintiff's breach of fiduciary duty claim.

# I

## Facts and Travel

The essential facts of this case are not in dispute. Augusta Hathaway lived in her home in Barrington for nearly fifty years. She married twice, and had three daughters: Joan Prout-Oscarsson, Wenda Branson, and Marion Louttit. In 1992, following the death of her second husband, Ms. Hathaway created the Augusta P. Hathaway Living Trust Agreement to distribute her assets upon her death. In addition, the trust contained language that required the trustee to apply "so much of the net income and principal of the Trust Estate, even to the extent of exhausting principal, as the Settlor may at any time or times direct in writing or as the Trustee may deem advisable for the Settlor's support, maintenance, health, education, or welfare."

In 1997, the trust was amended to include an equalization clause, which provided that:

> "[T]he Trustee shall take into consideration that it is the Settlor's
> desire and intention that all of the Settlor's children share equally in
> her estate. To that end, in distributing the Trust Estate, per stirpes,
> to the Settlor's issue, the Trustee shall consider all gifts and loans

---

[2] Joan Prout-Oscarsson, Ms. Hathaway's oldest daughter, and Kristal Osborn, Branson's daughter, were joined as third-party defendants in the Superior Court case, but neither has joined in either of the cross-appeals to this Court.

made by the Settlor to her children or other issue during her lifetime. Gifts and loans made to each child and his or her issue shall be added together to arrive at a total family share for each child. To the extent that the total family shares for each child are unequal, the Trustee shall first allocate to each child and to the issue of a deceased child the amount or amounts necessary which, when added to the total family share for each child will equalize the total amounts given to each child's family during the Settlor's lifetime."

Around the same time, Ms. Hathaway also established the A. P. Hathaway Family Limited Partnership, to which she deeded her Barrington home. The partners to the limited partnership were Ms. Hathaway, who retained the general interest, and limited partners Louttit, who also retained an interest for the benefit of her two children, and Branson, who also retained an interest for the benefit of Kristal Osborn, who was then a minor child.[3] Over the next several years, Ms. Hathaway gifted additional interests in the limited partnership to her children and grandchildren. The last unchallenged gifting document, executed in 1999, indicates that Hathaway retained 44.1 percent, Louttit owned a combined 31.06 percent for herself and her children, and Branson owned a combined 24.84 percent for herself and Kristal Osborn.

The record reveals that, in the fall of 2000, Louttit and her mother discussed Louttit's wish to move into the Barrington home with her husband, Jonathan, and their family as soon as some planned construction at the home could be completed.[4] However, Louttit and Jonathan had difficulty securing a loan to pay for the construction because the ownership of Ms. Hathaway's home was divided among the other members of the limited partnership.

---

[3] Kristal Osborn was previously known as Kristal Fahey, which is the name by which she is referred to in Ms. Hathaway's partnership gifts. Ms. Hathaway's eldest daughter, Joan Prout-Oscarsson, had no interest in the limited partnership. It seems clear from the record that Ms. Hathaway and Prout-Oscarsson were estranged during all relevant periods.

[4] To avoid confusion, we will refer to Jonathan Louttit by his first name. No disrespect is intended.

In October 2000, Louttit and Jonathan met with Ms. Hathaway's attorney, Andrew Davis, for the purpose of effecting changes to Ms. Hathaway's estate plan. Mr. Davis's legal bills for the date in question indicate that the purpose of the meeting was to conduct a "review of partnership documents and prepare [a] new gifting letter."

Facing the trials and increasing infirmities of age, Ms. Hathaway moved into an assisted living facility in November 2000. Sadly, just a few weeks later, she attempted suicide and was admitted to Butler Hospital for care. When asked why she had tried to take her own life, she responded, "to relieve my family of the burden of taking care of me" and that "[t]his is the easiest way to give my house to them." Ms. Hathaway was discharged from inpatient care on December 1, 2000. In a discharge report, her treating physician diagnosed Ms. Hathaway as having bipolar disorder, type II depressed, and "Alzheimer's dementia, mild." Her physician reported that Ms. Hathaway "requires a higher level of care secondary to obvious cognitive deficits" and that "[s]he demonstrates impairments in the areas of safety, medication management, and money management." Importantly, the physician at Butler Hospital also reported that "[s]he demonstrates significant difficulty in determining negative consequences of her actions and poor coping skills as well" and that "she had difficulty weighing the risks, benefits, and alternatives to suicide for handing her property over to her family."

It is also noteworthy that, in the months following her discharge from Butler Hospital, Ms. Hathaway made several changes to her estate plan, all of which were geared toward shifting the major portion of her estate to the Louttit family and away from Branson and Osborn. Ms. Hathaway signed two documents (the partnership gifts) transferring her remaining interest in the limited partnership, including the general partnership share, to Louttit and her family. She also made several amendments to her trust. The first, signed on December 19, 2000, appointed Louttit

as trustee. Another amendment, signed on February 28, 2001, made Branson and Osborn's beneficiary interest in the trust conditional on the transfer of their interest in the limited partnership to Louttit. The relevant language of that amendment provided:

> "Notwithstanding anything herein to the contrary, it is the Settlor's specific intent that all of the interests in THE AUGUSTA P. HATHAWAY FAMILY LIMITED PARTNERSHIP be owned by MARION P. LOUTTIT and her family, in spite of the fact that such ownership might result in an ultimate unequal distribution of the Settlor's estate. To that end, the Settlor hereby provides that any and all benefits or trust distributions provided for WENDA P. BRANSON and/or KRISTAL A. FAHEY pursuant to this trust are contingent upon the said WENDA P. BRANSON and KRISTAL A. FAHEY transferring, without consideration, all of their respective interests in THE AUGUSTA P. HATHAWAY FAMILY LIMITED PARTNERSHIP to MARION P. LOUTTIT or if she is not then living, to her living issue per stirpes. Said transfer to be accomplished within ninety (90) days of the Settlor's death, provided however, that MARION P. LOUTTIT may, at her sole discretion elect to purchase within said ninety (90) day period said interests in THE AUGUSTA P. HATHAWAY FAMILY LIMITED PARTNERSHIP from WENDA P. BRANSON and KRISTAL A. FAHEY at such price and upon such terms and conditions as MARION P. LOUTTIT shall deem appropriate."

Around the time of those amendments, Jonathan sent a letter to Branson, in which he asked that she and Osborn surrender their shares in the limited partnership. In that correspondence, Jonathan represented that making the transfers would have the result of "saving the estate almost $200,000 in estimated estate taxes." He clarified, however, that "it is still your mother's intention that you, Marion and Joan will eventually share equally in her estate at the time of her death. That will include the value of the house." Jonathan later testified at trial that, in fact, there would not have been any savings in estate taxes because the house already had been conveyed to the limited partnership in 1997. In any event, Branson and Osborn did not comply with Jonathan's request and did not surrender their shares in the limited partnership.

Soon after she received the letter from Jonathan, Branson received another letter, this one purportedly from Ms. Hathaway. The relevant portions of that letter said:

> "As you know, my arthritis has now made it impossible for me to write letters to people. Because of this, I've asked one of the secretary's [*sic*] at [the assisted living facility] to type this for me.
>
> "* * *
>
> "What I would like you to do is to please call Andrew Davis, my attorney and make arrangements to transfer your shares in the partnership back to me. Since you now have a copy of my will you know that I intend to leave you, Marion and Joan equal shares in my estate when I'm gone. However, if we can not resolve the problems with the partnership I may have to rethink my estate planning."

Although the letter was purported to have been written by Ms. Hathaway, Jonathan later testified that, in fact, he had drafted the letter after meeting with Ms. Hathaway at the assisted living facility and that she had not dictated the letter to him. He claimed, however, that he later reviewed the contents of the letter with Ms. Hathaway.

Concerned because she was being asked to give up her shares in the limited partnership, Branson set up a meeting with Ms. Hathaway, Prout-Oscarsson, and Osborn over dinner for the purpose of discussing the potentially uneven distribution of Ms. Hathaway's estate. Branson surreptitiously recorded much of the conversation because, she later testified, she was worried that Ms. Hathaway would not be able to remember the conversation and Branson wanted to be able to play the recording to her mother to remind her of what she had said.[5] Branson and Prout-Oscarsson asked their mother to explain why Louttit was to receive the lion's share of the limited partnership interest. In her response to that inquiry, Ms. Hathaway said, "It was always meant that you and

---

[5] A review of the transcript of their conversation reveals that, when Ms. Hathaway questioned Branson about the recording device, Branson told her that it was "[a] radio, just in case we want to listen to the radio." Later, Ms. Hathaway asked whether their conversation was being recorded and Branson replied, "So you'll remember."

Joan would get the money and Marion there would take the house" and that she "wanted everybody to get an equal share." When Branson asked how the daughters would get an equal share if Louttit owned the entire house, the following exchange ensued:

| "BRANSON: | [D]id Joan and I get equal amounts of money that equal, is the same as what Marion gets in the house? |
| --- | --- |
| "HATHAWAY: | I don't know. |
| "BRANSON: | Well, how can it be equal if it's not? |
| "HATHAWAY: | Well, she's got an attorney. |
| "PROUT[-OSCARSSON]: | So do we. |
| "HATHAWAY: | Yeah, all right. Andrew Davis? |
| "BRANSON: | Yeah, but that's - - you're supposed to be, that's your attorney, not Marion's. |
| "HATHAWAY: | Oh, well, I don't have an attorney, I don't need one." |

Ms. Hathaway made the final amendment to her living trust several months later, on August 3, 2001. That amendment made Louttit the trustee and dispensed with any pretense of distributing the trust assets equally upon Ms. Hathaway's death. Instead, the amendment provided that Branson, Osborn, and Prout-Oscarsson would each receive $2,000 from the trust, while the remaining balance of the trust assets would be distributed to Louttit or her living issue. The amendment also added a no-contest clause, which provided that "[i]f any beneficiary hereunder or heir at law shall contest the validity of this Trust Amendment * * * then all benefits provided for such beneficiary or heir at law shall lapse as if such beneficiary had predeceased the Settlor."

There can be no doubt that Louttit and Jonathan were intricately involved with the changes to Ms. Hathaway's estate plan during this period. Louttit scheduled her mother's appointments

with her attorney and drove Ms. Hathaway to meet with Mr. Davis to discuss drafting the partnership gifts and trust amendments. Louttit and Jonathan were present for all those meetings and they also were present when Ms. Hathaway executed the partnership gifts and amendments to the trust, with the sole exception of the August 3, 2001 trust amendment, which she signed at the assisted living facility rather than at her attorney's office. Jonathan was also in routine contact with Mr. Davis, and Jonathan sent emails to him on more than one occasion to discuss the limited partnership and the trust amendments.

In 2003, Ms. Hathaway inherited $10,000 after the passing of one of her friends. Louttit, who had held Ms. Hathaway's financial power of attorney since 1997, sent an email to Mr. Davis seeking advice on how to proceed with the inheritance check her mother had received. Louttit wrote of her mother, "She doesn't want my two sisters to know about this money. She told Jon and I she wants to put the money in our children's accounts for their education. * * * I don't want it to look like I just deposited this money into our children's accounts." Later, Louttit, on behalf of her mother, deposited the inheritance funds into college savings accounts for her two children.

Ms. Hathaway passed away in November 2008. Branson brought this suit in August 2009 seeking to void the 2000 and 2001 partnership gifts and the February 28 and August 3, 2001 trust amendments. Branson also alleged that Louttit had breached her fiduciary duty as trustee by diverting funds from the trust. A jury trial was held in December 2014.

At trial, Branson presented the testimony of John Stoukides, M.D., an expert qualified in geriatric medicine and palliative care. Doctor Stoukides, who had practiced in the field of geriatric and palliative care for over twenty-five years, testified that he had reviewed Ms. Hathaway's medical records from various dates between 1997 and 2004. Doctor Stoukides was asked at trial: "Were you asked to evaluate Augusta Hathaway's capacity to make gifts to her daughter?" He

responded: "I was asked to basically look at her cognitive ability as was documented in her medical records and render an opinion whether or not I felt she had the requisite capacity to make complex financial decisions, so I think that's a yes to your answer."

Doctor Stoukides reported that Ms. Hathaway had been suffering from memory problems since at least 1997, when she visited a neurologist who, after a follow-up appointment in early 1998, diagnosed Ms. Hathaway with early Alzheimer's disease. Doctor Stoukides also reviewed the report of an occupational therapist who had evaluated Ms. Hathaway during her stay at Butler Hospital in late 2000. According to Dr. Stoukides, the occupational therapist had given Ms. Hathaway a series of coins to count, but, he testified, "she couldn't even comprehend the value of the coins and give her a value of, you know, what a quarter, a dime, a nickel, and a penny are worth." He reported that it was the opinion of the occupational therapist that Ms. Hathaway "didn't have the ability to manage her finances and she didn't have the ability to recognize the implications of her decisions."

After reviewing those reports, Dr. Stoukides testified that he believed, to a reasonable degree of medical certainty, that "Mrs. Hathaway at the time she was in Butler Hospital had significant impairments in her memory, her learning ability, her reasoning, her financial skills, and her ability to understand the implications of her actions[.]" He added that "[s]he just didn't have any cognitive capacity that would allow her to, one, determine what she wanted to do, follow through with it, and understand the implications of what she was doing at that time." Consequently, it was his belief, again to a reasonable degree of medical certainty, that Ms. Hathaway lacked testamentary capacity at the time she executed the amendments to the trust and signed the gift letters. When pressed to give his understanding of the meaning of "testamentary capacity," Dr. Stoukides answered: "Testamentary capacity is the ability of someone to understand

their -- the value of their estate; to understand who naturally would get their estate upon their death; and understand the implication -- the process of giving that estate to various people." He also testified that Ms. Hathaway's condition had left her susceptible to undue influence, and explained his understanding of "undue influence" as follows:

> "Basically it's the susceptibility, I guess, of a person to be influenced by another because of either their need for acceptance of the other, their dependence on another person to meet their needs, or to get their information and to make a decision that isn't their decision based on the influence of another person that would go against their values, against their baseline construct of what that person is and be changed by another person."

At the close of all evidence, Louttit moved for judgment as a matter of law pursuant to Rule 50 of the Superior Court Rules of Civil Procedure, arguing that Branson's claims were barred by the doctrine of laches and that the evidence that had been presented did not support Branson's claims for breach of fiduciary duty, testamentary capacity, or undue influence. The trial justice denied that motion and submitted the questions of testamentary capacity, undue influence, and breach of fiduciary duty to the jury. The jury returned a verdict in Branson's favor on all three counts, finding that Ms. Hathaway had lacked testamentary capacity and that she had been unduly influenced by Louttit. The jury further found that Louttit had breached her fiduciary duty, and it awarded damages to the trust in the amount of $441,290.

Louttit subsequently renewed her motion for judgment as a matter of law and filed an additional motion for new trial pursuant to Rule 59 of the Superior Court Rules of Civil Procedure, and/or for a remittitur, adding to her previous arguments the contention that the jury's excessive damages award demonstrated that the verdict was the product of impermissible passion, sympathy, and prejudice, and that the trial court should have given certain instructions that she had requested. The trial justice denied Louttit's motions with respect to the claims of testamentary capacity and

undue influence. However, for reasons discussed in more detail *infra*, the trial justice granted both motions with respect to the breach of fiduciary duty verdict. Judgment was entered on February 4, 2016, voiding the trust amendments of February 28 and August 3, 2001, and the interests conveyed on December 27, 2000, and January 2, 2001, on the basis of the claims of testamentary capacity and undue influence. Branson and Louttit each timely appealed.

## II

### Standard of Review

"Our review of a trial justice's decision on a motion for judgment as a matter of law is *de novo*." *Azar v. Town of Lincoln*, 173 A.3d 862, 865 (R.I. 2017) (quoting *Roach v. State*, 157 A.3d 1042, 1049 (R.I. 2017)). When conducting such a review,

> "we, like the trial justice, examine * * * 'the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and draw from the record all reasonable inferences that support the position of the nonmoving party. If, after such a review, there remain factual issues upon which reasonable persons might draw different conclusions, the motion for judgment as a matter of law must be denied, and the issues must be submitted to the jury for determination.' * * * When there are no relevant factual issues and 'defendant is entitled to judgment as a matter of law, then the trial justice should grant the motion and dismiss the complaint.'" *Filippi v. Filippi*, 818 A.2d 608, 617 (R.I. 2003) (brackets, deletion, and internal citations omitted) (quoting *Marketing Design Source, Inc. v. Pranda North America, Inc.*, 799 A.2d 267, 271-72 (R.I. 2002)).

On the other hand, "when we review a trial justice's ruling on a motion for new trial, we afford it 'great weight.'" *Bajakian v. Erinakes*, 880 A.2d 843, 851-52 (R.I. 2005) (quoting *Sarkisian v. NewPaper, Inc.*, 512 A.2d 831, 835 (R.I. 1986)). "In considering a motion for a new trial, the trial justice sits as a super juror and is required to make an independent appraisal of the evidence in light of his or her charge to the jury." *Letizio v. Ritacco*, 204 A.3d 597, 602 (R.I. 2019) (quoting *Kemp v. PJC of Rhode Island, Inc.*, 184 A.3d 712, 719 (R.I. 2018)). "If, after conducting

- 11 -

this analysis, the trial justice concludes that the evidence is evenly balanced or that reasonable minds could differ on the verdict, she or he should not disturb the jury's decision." *Id.* (quoting *Kemp*, 184 A.3d at 719). "We will not disturb such a ruling by a trial justice 'unless he or she overlooked or misconceived material evidence or was otherwise clearly wrong in performing his or her function.'" *Bajakian*, 880 A.2d at 852 (quoting *Sarkisian*, 512 A.2d at 835). Moreover, "we accord great deference to the trial justice's assessment of the credibility of witnesses." *Id.*

## III

## Discussion

Louttit and Branson each appealed from the trial justice's decisions on Louttit's motions for new trial and for judgment as a matter of law. As an initial matter, Louttit argues that the equitable doctrine of laches should have estopped Branson from bringing suit. Alternatively, Louttit argues that the trial justice should have granted her motions for judgment as a matter of law or for new trial on the issues of undue influence and testamentary capacity. Louttit also argues that the excessive damage award by the jury demonstrated that the verdict, as a whole, was tainted by improper passion, sympathy, and prejudice, and that she is therefore entitled to a new trial on all counts. Finally, she argues that, on remand, she is entitled to a new bench trial on the issues of testamentary capacity and undue influence if Branson's appeal on the sole legal claim of breach of fiduciary duty is sustained.

In a cross appeal, Branson argues that the trial justice should not have granted the motions for new trial and for judgment as a matter of law on the issue of breach of fiduciary duty.

## A

## Laches

Louttit first argues that Branson's claims are barred by the equitable doctrine of laches. We do not agree.

"Laches is an equitable defense that precludes a lawsuit by a plaintiff who has negligently sat on his or her rights to the detriment of a defendant." *Hazard v. East Hills, Inc.*, 45 A.3d 1262, 1269 (R.I. 2012) (quoting *O'Reilly v. Town of Glocester*, 621 A.2d 697, 702 (R.I. 1993)). Significantly, "[t]he defense of laches 'involves not only delay but also a party's detrimental reliance on the status quo.'" *Id.* at 1269-70 (quoting *Andrukiewicz v. Andrukiewicz*, 860 A.2d 235, 241 (R.I. 2004)); *see Chase v. Chase*, 20 R.I. 202, 203-04, 37 A. 804, 805 (1897) ("Laches, in legal significance, is not mere delay, but delay that works a disadvantage to another."). "Generally, a party asserting the affirmative defense of laches bears the burden of proof with respect to that defense." *Raso v. Wall*, 884 A.2d 391, 395 n.12 (R.I. 2005). The defense of laches sounds in equity and, therefore, the applicability of the defense "in a given case generally rests within the sound discretion of the trial justice." *Hazard*, 45 A.3d at 1270.

Louttit argues that the doctrine of laches bars Branson's claims because she chose to wait until August 2009 to challenge the trust amendments and the partnership gifts of 2000 and 2001. Louttit notes that, after all, Branson "began complaining about her share of Settlor's assets in early to mid-January 2001[.]" The thrust of her argument seems to be that, by delaying suit until after Ms. Hathaway's death, Branson deprived Louttit of the benefit of Ms. Hathaway's testimony. However, there is no indication that Ms. Hathaway's testimony would have been favorable to Louttit and unfavorable to Branson and, as the trial justice noted, Louttit also had the opportunity to adjudicate the validity of the challenged instruments before Ms. Hathaway's death but chose

not to do so.  Therefore, even if we assume for the sake of argument that Branson unreasonably delayed in bringing her suit, we can discern no prejudice that inured to Louttit's detriment.  We therefore affirm the trial justice's ruling on this issue.

## B

## Undue Influence

We next address Louttit's contention that she should have been awarded judgment as a matter of law or, alternatively, a new trial, on the matter of undue influence.  "Undue influence is the substitution of the will of the dominant party for the free will and choice of the subservient party." *Bettez v. Bettez*, 114 A.3d 82, 85 (R.I. 2015) (brackets omitted) (quoting *In re Estate of Picillo*, 99 A.3d 975, 982 (R.I. 2014)).  "When determining what constitutes undue influence, a trial justice ordinarily examines the totality of the circumstances, including the relationship between the parties, the physical and mental condition of the subservient party, the opportunity and disposition of the person wielding influence, and his or her acts and declarations."  *Id.* (brackets omitted) (quoting *In re Estate of Picillo*, 99 A.3d at 982).  "Ordinarily, 'the question of whether undue influence exists is a fact-intensive inquiry.'"  *Id.* (brackets omitted) (quoting *In re Estate of Picillo*, 99 A.3d at 982).

## 1

## Motion for Judgment as a Matter of Law

With respect to the denial of her motion for judgment as a matter of law on the issue of undue influence, Louttit contends that the trial justice erred because he accorded excessive weight to the testimony of Dr. Stoukides and insufficient weight to the testimony of Andrew Davis, Ms. Hathaway's estate planning attorney, and to the testimony evincing "Augusta's love of her home, her desire to keep it in the family, her strong personality, her intact long term memory, and her

statements as to the treatment she received from Wenda, Joan, and Kristal." In addition, Louttit argues that "[t]here was no evidence introduced at trial to support a finding or inference that [Louttit], as the dominant person, coerced her mother to make the amendments to the Trust and to make the [limited partnership] gifts."

In our opinion, those arguments are unconvincing because they do no more than challenge the weight ascribed to the various witnesses and to the other evidence in this case, even though all inferences must be drawn in favor of the nonmoving party when a trial justice considers a motion for judgment as a matter of law. As we have said on many occasions in the past, on a motion for judgment as a matter of law, we, like the trial justice, are tasked with examining "the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and draw[ing] from the record all reasonable inferences that support the position of the nonmoving party." *Filippi*, 818 A.2d at 617 (quoting *Marketing Design Source, Inc.*, 799 A.2d at 271). Indeed, our jurisprudence is crystal clear that the trial justice is *required* to draw all reasonable inferences in favor of the nonmoving party on a motion for judgment as a matter of law. That is precisely what the trial justice did in this case.

In addition, and contrary to Louttit's assertions, the record is replete with evidence that tends to support the jury's finding that Louttit unduly influenced Ms. Hathaway for her own benefit. Regarding Ms. Hathaway's susceptibility to the overbearing will of others, Dr. Stoukides testified that Ms. Hathaway had been plagued by memory loss since at least 1997, and that she had been diagnosed with Alzheimer's disease in 1998.[6] Her medical records reveal that, when asked why she had attempted to commit suicide in November 2000, Ms. Hathaway replied: "to relieve

---

[6] We agree with Louttit that a diagnosis of Alzheimer's disease, standing alone, is not sufficient evidence to support a finding of susceptibility to undue influence or a lack of testamentary capacity. It is, however, certainly appropriate for the factfinder to consider such a diagnosis.

my family of the burden of taking care of me" and, "[t]his is the easiest way to give my house to them." An occupational therapist at Butler Hospital reported at that time that Ms. Hathaway "didn't have the ability to manage her finances and she didn't have the ability to recognize the implications of her decisions." Importantly, after reviewing Ms. Hathaway's medical records, Dr. Stoukides testified that it was his opinion, to a reasonable degree of medical certainty, that "Mrs. Hathaway at the time she was in Butler Hospital had significant impairments in her memory, her learning ability, her reasoning, her financial skills, and her ability to understand the implications of her actions[.]" He further opined that:

> "in light of her cognitive impairment, her memory loss, her difficulty learning, the fact that she had one person that would take her to all of her appointments, would do everything with her, she clearly had that susceptibility. She had the dependence, she had impairment, she is somebody who could have easily been unduly influenced by another person because she didn't have the ability to come up with the answer herself, or plan herself."

Viewing the evidence in the light most favorable to the nonmoving party, as we must when reviewing a decision on a motion for judgment as a matter of law, the evidence is more than sufficient to support a finding that Louttit was well positioned to take advantage of Ms. Hathaway's susceptibility to undue influence, and that she did so. She held Ms. Hathaway's financial power of attorney at all relevant times. Louttit and Jonathan were present every time Ms. Hathaway discussed her estate plan with her attorney, and they were present when the partnership gifts and trust amendments were signed, with the sole exception of the August 3, 2001 trust amendment. When Ms. Hathaway met with her estate planning attorney, it was Louttit who scheduled the appointments and Louttit who transported Ms. Hathaway to her attorney's office. Also, Jonathan, Louttit's husband, routinely contacted Ms. Hathaway's attorney to discuss the limited partnership and the trust amendments.

- 16 -

Moreover, it is significant to us, as it was to the trial justice, that Ms. Hathaway consistently had expressed her intent to divide her estate evenly among her daughters at least as late as 1997, when she added an equalization clause to the trust. Indeed, Ms. Hathaway continued to maintain that it was her intention to divide her estate evenly among her daughters even when the documents she was signing in 2000 and 2001 specified the very opposite outcome. At her meeting with Branson, Prout-Oscarsson, and Osborn in the summer of 2001, Ms. Hathaway told Branson that "[i]t was always meant that you and Joan would get the money and Marion there would take the house" and that she "wanted everybody to get an equal share." When Branson pointed out that the recent changes did not bear that out, Ms. Hathaway seemed to believe that an attorney engaged by Louttit, and not by her, was responsible for the change.

Given the evidence in the record, we can arrive at no conclusion other than that, at the very least, "there remain factual issues upon which reasonable persons might draw different conclusions," and thus Louttit's motion for judgment as a matter of law with regard to undue influence was properly denied.[7] *Filippi*, 818 A.2d at 617 (quoting *Marketing Design Source, Inc.*, 799 A.2d at 271).

---

[7] In her brief to this Court, Louttit quoted the instructions that the trial justice gave to the jury with regard to the claims of undue influence, and then quoted the answer Dr. Stoukides provided when asked to explain his understanding of the term "undue influence," which answer is set forth above in this opinion. Louttit added that "Dr. Stoukides was then repeatedly asked his opinion, over defense counsel's objection, as to whether Augusta was susceptible to undue influence. * * * Of course, he said yes and, once again, based his opinions on the contents of her medical records." We are unclear as to what argument Louttit was attempting to make with those comments. In any event, the argument was not developed, and therefore it has been waived. *See McGarry v. Pielech*, 108 A.3d 998, 1005 (R.I. 2015) ("[A] failure to raise and develop [an alleged error] in [a party's] briefs constitutes a waiver of that issue on appeal and in proceedings on remand.").

- 17 -

**2**

**Motion for New Trial**

Alternatively, Louttit argues that she merited a new trial on the issue of undue influence "because (a) the verdict was wrong because it failed to respond truly to the merits and to administer substantial justice between the parties; (b) the verdict is against the fair preponderance of the evidence; and (c) the [c]ourt committed a number of prejudicial errors of law[.]"

Louttit's first two arguments are essentially attacks on the credibility assessments of the trial justice when he ruled on her motion for new trial. Louttit's chief complaint seems to be that the trial justice credited the testimony of Dr. Stoukides.[8] However, "we accord great deference to the trial justice's assessment of the credibility of witnesses." *Bajakian*, 880 A.2d at 852. Moreover, "when we review a trial justice's ruling on a motion for new trial, we afford it 'great weight'" and "[w]e will not disturb such a ruling by a trial justice 'unless he or she overlooked or misconceived material evidence or was otherwise clearly wrong in performing his or her function.'" *Id.* at 851-52 (quoting *Sarkisian*, 512 A.2d at 835). Having reviewed the evidence and the decision of the trial justice, we are satisfied that he neither overlooked nor misconceived material evidence.

Louttit argues that Dr. Stoukides's testimony was not credible because he neither treated nor even met Ms. Hathaway and had never actually spoken to Ms. Hathaway's daughters, friends, treating physicians, or caregivers. Louttit acknowledges, however, that Dr. Stoukides "based his

---

[8] In a subheading of her brief, Louttit argues that "It was a Prejudicial Error of Law to Allow, Over the Defendant's Objections, Dr. Stoukides's Opinions on Testamentary Capacity and Undue Influence." However, to support this argument, she directs our attention to other sections in her brief regarding the admission of Dr. Stoukides's opinion of what constitutes testamentary capacity. Expert testimony regarding testamentary capacity is obviously distinct from the testimony regarding undue influence, but, to the extent that we can identify any overlap between these issues, we can discern no error.

opinions on the contents of [Ms. Hathaway's] medical records." This is proper for an expert medical witness. *See* R.I. R. Evid. 703 ("An expert's opinion may be based on a hypothetical question, facts or data perceived by the expert at or before the hearing, or facts or data in evidence. If of a type reasonably and customarily relied upon by experts in the particular field in forming opinions upon the subject, the underlying facts or data shall be admissible without testimony from the primary source."). Importantly, Louttit did not contest Dr. Stoukides's qualification as an expert in geriatric medicine and palliative care. Absent an adequately presented objection, Dr. Stoukides's testimony became so much grist for the jury and, on a motion for new trial, the trial justice was free to credit his testimony. *See Bajakian*, 880 A.2d at 851-52.

Louttit also suggests that the trial justice should have given more weight to the

> "substantial evidence of Augusta's love of her home, her desire to keep it in the family, her strong personality, her intact long term memory, and her statements as to the treatment she received from Wenda, Joan and Kristal. And – importantly – Attorney Davis's opinion that there was nothing inappropriate about the relationship between Marion and Augusta that caused him to believe that this was not her free act and was in accordance with her wishes."

However, Louttit fails to direct our attention to those portions of the record that contain that evidence.[9] When reviewing a motion for new trial, the party challenging the ruling of the trial justice has the difficult task of demonstrating that the trial justice "overlooked or misconceived

---

[9] Indeed, the trial justice considered Mr. Davis's testimony when he ruled on the motion for new trial, albeit he did so with regard to the issue of Ms. Hathaway's testamentary capacity, which we do not reach. The trial justice noted that "Mr. Davis testified that he was not told about the admission to Butler, he was not told about the suicide attempt, he was not told about the dementia[.]" The trial justice concluded that, although Mr. Davis testified that he believed Ms. Hathaway understood the estate planning documents at issue, "[t]he [c]ourt does find that he was not fully informed in order to make those observations." This was a supportable credibility assessment with which we can find no fault. *See Bajakian v. Erinakes*, 880 A.2d 843, 852 (R.I. 2005). Moreover, we note that Mr. Davis's testimony regarding the propriety of Ms. Hathaway's relationship with Louttit was explicitly stricken from the record.

- 19 -

material evidence or was otherwise clearly wrong in performing his or her function." *Bajakian*, 880 A.2d at 852 (quoting *Sarkisian*, 512 A.2d at 835). Louttit has not directed us to any evidence that might satisfy that task, and "we will not 'scour the record to identify facts in support of [her] broad claims, and we will not give life to arguments that [she] has failed to develop on [her] own.'" *Terzian v. Lombardi*, 180 A.3d 555, 558 (R.I. 2018) (quoting *McMahon v. Deutsche Bank National Trust Co.*, 131 A.3d 175, 176 (R.I. 2016) (mem.)).

As for the "number of prejudicial errors of law" that Louttit claims were made by the trial justice, the only claims of error that apply to the matter of undue influence are the trial justice's decision not to give a requested jury instruction and the admission of Dr. Stoukides's opinion of what constitutes undue influence.[10]

Before the Superior Court, Louttit requested that the following jury instruction be given:

> "It is universally accepted that the law jealously guards a person's right to dispose of his or her property as he or she sees fit. It is not for you to decide whether the final distribution outlined in Augusta Hathaway's Trust was fair in global terms."

---

[10] Louttit offers a buffet table of claimed errors, including:

> "a.     Allowing plaintiff's counsel, over defense counsel's objections, to ask the plaintiff's specially retained medical expert, John Stoukides, M.D., opinions based on Dr. Stoukides's personal, incorrect definition of testamentary capacity;

> "b.     Allowing plaintiff's counsel, over defense counsel's objections, to ask his specially retained medical expert, John Stoukides, M.D., opinions based on Dr. Stoukides' personal, incorrect definition of undue influence;

> "c.     Submitting the breach of fiduciary duty claim to the jury; and

> "d.     Failing to give certain jury instructions requested by the defendant."

Louttit argues that, by failing to give this instruction, the trial justice "rubber stamped" Dr. Stoukides's opinion that Ms. Hathaway was susceptible to undue influence.

We have said that a refusal to grant a requested jury instruction "constitutes reversible error only if the requested instruction (assuming that it is otherwise appropriate) is not 'fairly covered' in the instructions that the trial justice actually chooses to give." *State v. Imbruglia*, 913 A.2d 1022, 1033 (R.I. 2007) (quoting *State v. Price*, 706 A.2d 929, 934 (R.I. 1998)). The instruction actually imparted by the trial justice was as follows:

> "If expert testimony is admitted into this case, you will be required to assess the credibility of that testimony and determine how much weight you will give it. Simply because a witness has been identified to you as an expert does not mean that you are required to accept what he or she says as true. You must consider each expert opinion admitted into evidence in this case and give it such weight as you think it deserves."

It is the opinion of this Court that the instruction given was appropriate, and "fairly covered" the jury's charge to weigh the expert opinions provided and to assess their credibility. *Imbruglia*, 913 A.2d at 1033 (quoting *Price*, 706 A.2d at 934).

Louttit also argues that it was error to allow Dr. Stoukides to give "his personal, (incorrect) definition[] of * * * undue influence." Doctor Stoukides testified that he understood the concept of undue influence to be as follows:

> "Basically it's the susceptibility, I guess, of a person to be influenced by another because of either their need for acceptance of the other, their dependence on another person to meet their needs, or to get their information and to make a decision that isn't their decision based on the influence of another person that would go against their values, against their baseline construct of what that person is and be changed by another person."

Despite Louttit's claim to the contrary, we fail to discern any meaningful difference between that testimony and the definition of undue influence that has been adopted by this Court. As recounted

- 21 -

*supra*, we have defined undue influence to be the "substitution of the will of the dominant party for the free will and choice of the subservient party." *Bettez*, 114 A.3d at 85 (brackets omitted) (quoting *In re Estate of Picillo*, 99 A.3d at 982). Doctor Stoukides's recitation is largely in line with that definition and therefore the admission of his testimony in that regard did not prejudice Louttit in any way.

For all of these reasons, it is clear to us that the trial justice performed his duty properly when considering the motion for new trial and that he did not "overlook[] or misconceive[] material evidence" and was not "otherwise clearly wrong in performing his * * * function." *Bajakian*, 880 A.2d at 852 (quoting *Sarkisian*, 512 A.2d at 835). Accordingly, we will not disturb the ruling of the trial justice with regard to Louttit's motion for new trial on the issue of undue influence. *See id.* The challenged trust amendments and partnership gifts of 2000 and 2001 are thus void and of no force or effect.

## C

### Testamentary Capacity

Louttit argues that Branson failed to present sufficient evidence to support her claim that Ms. Hathaway lacked testamentary capacity to execute the trust amendments and limited partnership gifts. We do not reach that argument, however, because this Court, already having determined that the trust amendments and limited partnership gifts were properly nullified on the ground of undue influence, need not undertake any discussion of Ms. Hathaway's testamentary capacity, or lack thereof, because the issue has become moot. *See Boyer v. Bedrosian*, 57 A.3d 259, 272 (R.I. 2012) ("A case is moot if there is no continuing stake in the controversy, or if the court's judgment would fail to have any practical effect on the controversy.").

# D

## Passion, Sympathy, and Prejudice

Louttit next argues that a new trial is required on all counts because the jury was "influenced, if not overcome, by sympathy, passion and prejudice." She arrives at this conclusion because the jury found that Louttit had breached her fiduciary duty and awarded the trust the sum of $441,290 in damages—greatly exceeding the $10,000 that Branson had requested during the course of her closing argument. Although the trial justice granted Louttit's motion for judgment as a matter of law on the issue of fiduciary duty for reasons discussed *infra*, and thus vacated the award of damages, Louttit argues that only a new nonjury trial can remedy the taint of passion, sympathy, and prejudice that infected the entire verdict.

It is true that "when the trial justice determines that prejudice or other improper influences have significantly tainted the jury's award of the damages, there can be no assurance that the jury's determination on the issue of liability has not been similarly tainted." *Yammerino v. Cranston Tennis Club, Inc.*, 416 A.2d 698, 701 (R.I. 1980). Moreover, "[t]o assure the losing party that the substantive issue will be fairly determined on the evidence and according to law, a new trial must be ordered." *Id.* However, in this complex case, the jury was confronted with a number of claims and issues with which to grapple, and the jury's verdict, at least as to the issue of undue influence, was clearly supported by substantial evidence, at least to the point that "there remain[ed] factual issues upon which reasonable persons might draw different conclusions[.]" *Filippi*, 818 A.2d at 617 (quoting *Marketing Design Source, Inc.*, 799 A.2d at 271). We are unable to agree with Louttit's assertion that an excessive award of damages on one count, standing alone, is sufficient to support an inference that the jury's determination on other issues before it was the product of improper passion, sympathy, or prejudice.

**E**

**Claim for Nonjury Trial**

Finally, Louttit argues that she is entitled to a new bench trial on the issues of testamentary capacity and undue influence. Her argument on this issue, in its entirety, is as follows:

> "The trial judge recognized that the only reason that the case was decided by a jury was the presence of the breach of fiduciary duty claim. If that claim remains dismissed, this Court must give the appellant a new trial on the equitable claims of lack of testamentary capacity and undue influence."

We repeatedly have held that "simply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue." *Dunn's Corners Fire District v. Westerly Ambulance Corps*, 184 A.3d 230, 235 (R.I. 2018) (brackets omitted) (quoting *Giddings v. Arpin*, 160 A.3d 314, 316 (R.I. 2017) (mem.)). Louttit has not provided any caselaw for our review which might call the trial justice's decision into question, nor has she engaged in a meaningful discussion of this issue. We note that the trial justice determined, after reviewing this Court's precedent, that a litigant is entitled to a jury trial when a case presents both equitable and legal issues.[11] Based on that determination, the trial justice empaneled a jury "without prejudice to the issue being revisited" if the legal claims were later dismissed. However, neither party accepted that invitation to later revisit the issue. Accordingly, it is the opinion of this Court that

---

[11] We have said that "[t]his state follows the rule of practice that any claims that could have been litigated in an action at law in 1843 must be submitted to a jury upon demand of a party." *Connor v. Sullivan*, 826 A.2d 953, 958 (R.I. 2003). Moreover, "when a civil action comprises both legal and equitable claims, the legal claims, if adequately presented, must first be presented to a jury." *Egidio DiPardo & Sons, Inc. v. Lauzon*, 708 A.2d 165, 172 (R.I. 1998). In *Filippi v. Filippi*, 818 A.2d 608 (R.I. 2003), we held that a challenge on the basis of undue influence to a pour-over provision of a will that funded a revocable trust was more akin to a trust action than to a will contest, and that "plaintiffs do not have a constitutional right to a jury trial in this equitable matter." *Filippi*, 818 A.2d at 629.

Louttit has failed to preserve or adequately present this argument for our review, and the argument therefore has been waived.

F

**Fiduciary Duty**

Branson cross appealed from the judgment of the Superior Court. Her sole argument before this Court is that the trial justice erred when he granted judgment as a matter of law in favor of Louttit on Branson's claim that Louttit breached her fiduciary duty as trustee of Ms. Hathaway's living trust. Branson argues that, as a beneficiary of the trust, she suffered damage when Louttit deposited the $10,000 inheritance that Ms. Hathaway received in 2003 into college savings accounts for Louttit's children instead of putting that money into the trust. Branson also argues that Louttit used trust funds to pay for legal fees in connection with the challenged trust amendments and limited partnership gifts.

As the trial justice observed, because the trust amendments were rendered a nullity by the verdict on the issues of testamentary capacity and undue influence, the trust reverted to the structure that existed before those amendments were made. As a result, the equalization clause that was added to the trust in 1997 was again in full force and effect. That clause provided:

> "[T]he Trustee shall take into consideration that it is the Settlor's desire and intention that all of the Settlor's children share equally in her estate. To that end, in distributing the Trust Estate, per stirpes, to the Settlor's issue, the Trustee shall consider all gifts and loans made by the Settlor to her children or other issue during her lifetime. Gifts and loans made to each child and his or her issue shall be added together to arrive at a total family share for each child. To the extent that the total family shares for each child are unequal, the Trustee shall first allocate to each child and to the issue of a deceased child the amount or amounts necessary which, when added to the total family share for each child will equalize the total amounts given to each child's family during the Settlor's lifetime."

- 25 -

In accordance with that clause, any money that Louttit received from Ms. Hathaway, whether by means of a legitimate gift or as a result of a breach of fiduciary duty, would be taken into account when allocating each beneficiary's family share and "will equalize the total amounts given to each child's family during the Settlor's lifetime." Therefore, even if Louttit did breach her duty by diverting the $10,000 inheritance from the trust or by paying legal fees with trust funds, Branson cannot prove that she has been damaged by those actions.[12] Accordingly, Branson's claim for damages based on Louttit's alleged breach of fiduciary duty fails as a matter of law, and the trial justice was correct to grant Louttit's motion for judgment as a matter of law on this issue. Because we affirm the entry of judgment as a matter of law, we vacate the trial justice's grant of a new trial on the issue of fiduciary duty as superfluous.

## IV

## Conclusion

For the reasons set forth in this opinion, the judgment of the Superior Court is affirmed in all respects, and, because the trial justice granted judgment as a matter of law on the issue of breach of fiduciary duty, that portion of the February 4, 2016 order granting a new trial on that issue was unnecessary and is therefore vacated. The papers in this case shall be returned to the Superior Court.

---

[12] We observe that nothing in the various trust documents in the record before us required that all of Ms. Hathaway's assets be placed into the trust, nor did they prohibit Ms. Hathaway from making gifts of her assets while she still lived.

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Wenda Branson v. Marion P. Louttit, individually and in her capacities as Trustee of the Augusta P. Hathaway Living Trust and Custodian for Jonathan H. Louttit, II and Caroline Hathaway Louttit, minor children. |
| **Case Number** | No. 2017-149-Appeal. No. 2017-150-Appeal. (PC 09-5006) |
| **Date Opinion Filed** | June 28, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Luis M. Matos |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Joseph F. Hook, Esq. |
| | For Defendant:<br><br>David E. Maglio, Esq. |